**IN THE COURT OF APPEALS OF IOWA**

No. 14-0709
Filed December 23, 2015

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**BRIAN EMBREE,**
        Defendant-Appellant.

_____

Appeal from the Iowa District Court for Johnson County, Deborah Farmer

Minot, District Associate Judge.

Brian Embree appeals his conviction for indecent exposure. **AFFIRMED.**

Philip B. Mears of Mears Law Office, Iowa City, for appellant.

Thomas J. Miller, Attorney General, and Kelli A. Huser, Assistant Attorney

General, for appellee.

Heard by Potterfield, P.J., and Doyle and Tabor, JJ.

**POTTERFIELD, Presiding Judge.**

Brian Embree appeals his conviction for indecent exposure. His argument is twofold. First, he argues the district court improperly excluded evidence crucial to his defense, thus not only violating the rules of evidence but also depriving him of his constitutional rights. Second, he argues his trial counsel was ineffective in several respects. We find that Embree has not preserved error on the court's denial of the evidence in question. We preserve his claim that his counsel's representation was constitutionally deficient for possible postconviction proceedings. We therefore affirm his conviction.

## I.      Background Facts and Proceedings

On June 11, 2013, Embree was living with his wife and his 15-year-old stepdaughter, J.S. His wife was eight months pregnant at the time but was still working. She left for work early that morning. J.S. was on summer break and was still at home asleep after her mother left, so Embree woke her and told her to let the family's dogs out. J.S. got up, let the dogs out, and fed them. Then she returned to her room. She was aware that Embree wanted her to get started on additional chores, which were to include mowing the lawn, washing the dishes, and dusting the living room. Embree came to his stepdaughter's room a short while later looking for her and found her watching television. It is at this point in time that his and her accounts of the morning diverge dramatically.

According to J.S.'s testimony at trial, she was sitting on a chair and watching television when Embree entered her room without knocking. She thought he had come to yell at her because she was inside watching music videos instead of doing the chores he had assigned to her. J.S. was surprised

when Embree instead asked her if she would like to have sex with him. He had never done anything like that before. In fact, the two got along, and she enjoyed living with him. Taken aback, J.S. simply responded "no." Embree assured J.S. that she would enjoy it and tried to coax her into performing oral sex on him, but she again said "no." J.S. then retreated to her bed, where she backed into the corner and covered herself up to her neck with a blanket.

According to J.S., Embree continued to solicit her for sex, pulling his pants down in order to expose his erect penis. At this point, J.S. turned away entirely and covered her head with the blanket. From underneath the blanket, J.S. heard him begin to masturbate. A short while later, Embree asked J.S. for permission to use some of her lotion, but she kept covered and did not respond. She heard him grab her lotion—cocoa butter—from atop her dresser, take off the cap, and put some into his hand. He then resumed masturbating. While still hiding under the blanket, J.S. heard "stuff dropping" onto the pink rug on her bedroom floor. She believed that the sound she heard was Embree ejaculating. At that point, she peeked out from underneath the blanket and saw Embree rubbing the pink rug with a towel he had taken out of her laundry basket. After he finished, Embree turned and left without doing or saying anything further.

Embree has always denied J.S.'s account. According to his testimony at trial, he went to J.S.'s room immediately before leaving home for the day and stopped momentarily to yell at her for not having begun her chores. He claims nothing more happened: he did not ask J.S. to have sex with him; he did not ask her to perform oral sex on him; he did not take off his clothing in her bedroom; he did not expose his penis to her; she never hid from him underneath the covers of

her bed; he never ejaculated in front of her; and he never got down to clean the rug in her room.

To simultaneously bolster his own account and discredit J.S.'s, Embree wished to delve into evidence of electronic communications between J.S. and A.R., a boy from school. Embree testified at trial that on the night of June 12, 2013, he caught J.S. with an electronic device—an iPod—that she had been forbidden to use. Catching J.S. with the iPod was not particularly noteworthy, as she had been punished for similar misbehavior in the past. However, Embree hoped to focus at trial on the content discovered on the iPod. His primary point of contention on appeal arises from the fact that he was not allowed to do so. According to Embree, he discovered on the iPod a series of electronic messages that detailed a sexually explicit conversation between J.S. and A.R. that had taken place between June 4, 2013, and June 11, 2013. Collectively, the messages planned a series of future sexual encounters between J.S. and A.R. The encounters were to take place at Embree's home at a time of day when both he and his wife would be at work. Embree's theory of defense was that the content of those iPod messages was so embarrassing and damaging to J.S. that she was willing to do anything—namely, falsely accuse him of trying to have sex with her and, when she refused to do so, masturbating in front of her—in order to deflect her mother's anger and avoid the full repercussions of her planned sexual activities.

On the morning of trial, the district court granted the State's motion in limine prohibiting Embree from referring to any sexual content on the iPod. The court offered Embree an opportunity to proffer witnesses to make his record on

his requested evidence. Later the court ruled Embree could not tell the jury that he believed J.S. falsely accused him because he found a series of compromising sexual messages on the iPod; he could only say that he believed J.S. did so because he found she had used the iPod.

Embree testified at trial that he took the iPod to his wife, who became angry at J.S. It was at that time J.S. told her mother that Embree propositioned her for sex. Embree's wife became very upset and confronted him after J.S. made the allegation. She asked Embree if what J.S. told her was true and then slapped him across the face. She made a phone call, and the home was soon visited by officers. The jury heard testimony that Embree told those officers he believed J.S. made her accusation against him because he caught her with an iPod. He even took the iPod with him to the Johnson County Sheriff's Office when he went in for an interview so the detective assigned to the case could examine it.

The causal link between the iPod and J.S.'s allegation against Embree was disputed at trial. J.S. agreed that Embree came into her room the day after the incident and found the iPod lying on her bedroom floor, that he took it to show to her mother, and that her mother became angry and began yelling at her. But she denied that the timing of her accusation against Embree was directly related to his finding of the iPod. J.S. testified she had planned to tell her mother about the incident from the outset but did not do so until the next night both because she was scared and because an opportunity to be alone with her mother never presented itself. When she was caught with the iPod, she told her mother about Embree's sexual advances the prior day.

Additional witnesses testified at trial, but none had any firsthand knowledge of the incident itself. A.R. testified he was a friend of J.S.'s from school, that the two had communicated electronically in the past, and that they had planned to hang out in the future. He gave no testimony about the incident itself. A friend of Embree's wife testified that on the evening of June 12, 2013, she had called the police at Embree's wife's request and then gone over to the Embree residence with her husband in order to console J.S. and her mother. Law enforcement officers from the Johnson County Sheriff's Office testified about their response to Embree's home, where they conducted a preliminary investigation and seized multiple items—the bottle of cocoa butter, the pink rug, and several towels—for further testing and for use as evidence. A criminalist with the State of Iowa's Division of Criminal Investigation Crime Laboratory testified she was able to microscopically identify spermatozoa in three different locations on the pink rug, and the DNA profile of all three sperm profiles matched that of Embree. She explained that the probability of finding such a profile in a population of unrelated individuals chosen at random would be less than one out of 100 billion. Finally, an employee with the Iowa Department of Human Services and a forensic investigator with the St. Luke's Child Protection Center testified that as a part of the criminal investigation, J.S. was officially interviewed by the forensic investigator, who was trained to speak with children.

Embree did not dispute any of this testimony. He did, however, provide an alternate explanation for the presence of his spermatozoa on the pink rug. He explained that the pink rug had been in his bathroom prior to being placed in J.S.'s room, and his semen may have landed on the rug during that time period

because he had masturbated in the bathroom on multiple occasions. The rug had never been washed since coming into the family's home.

At trial, Embree faced a single count of indecent exposure, in violation of Iowa Code section 709.9 (2013). His case went to trial on the morning of Tuesday, February 18, 2014, and was submitted to the jury at 4:28 p.m. on Wednesday, February 19, 2014. At approximately 2:39 p.m. on Thursday, February 20, 2014, the jury submitted a note to the court stating: "After much deliberation and four votes, we are split and locked. We are asking for your direction for how to proceed from here." After conferring with the parties, the court gave the jury an additional instruction urging it to continue deliberating in hopes of arriving at a verdict. At 1:43 p.m. on Friday, February 21, 2014, the jury returned a verdict of guilty.

After he was found guilty, Embree changed counsel. His new counsel filed a motion for a new trial, making substantially the same arguments Embree now presents to us, along with an additional claim that the verdict was contrary to the weight of the evidence. The district court held an evidentiary hearing on Embree's new trial motion but ultimately denied it.

Embree now appeals.

## II. Standard of Review

We generally review the district court's evidentiary rulings for abuse of discretion. *See State v. Neiderbach*, 837 N.W.2d 180, 190 (Iowa 2013). But to the extent Embree's claims invoke his due process right to present a defense, our review is de novo. *See State v. Fox*, 491 N.W.2d 527, 530 (Iowa 1992); *State v. Peterson*, 532 N.W.2d 813, 816 (Iowa Ct. App. 1995); *see also*

*Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987) (adopting due process analysis for a criminal defendant's "right to put before the jury evidence that might influence the determination of guilty").

We may decide ineffective-assistance-of-counsel claims on direct appeal if we determine that the record is adequate. *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006). We review claims of ineffective assistance of counsel de novo. *Id.* We do so because such claims have their basis in the Sixth Amendment to the United States Constitution. *State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012).

### III. Analysis

#### A. Error Preservation

Before we can discuss Embree's claims, we must first address the State's argument that he has not properly preserved error regarding the disputed iPod messages. Ordinarily, in order to preserve error related to a court's ruling on a motion in limine, a party must take the additional procedural step of making a timely objection or offer of proof at trial. *See State v. Tangie*, 616 N.W.2d 564, 568 (Iowa 2000); *Quad City Bank & Tr. v. Jim Kircher & Assocs., P.C.*, 804 N.W.2d 83, 89 (Iowa 2011). With respect to rulings excluding evidence from trial, the party seeking to have the evidence admitted must make an offer of proof, the purpose of which is both "to give the trial court a more adequate basis for its evidentiary ruling and to make a meaningful record for appellate review." *See Parrish v. Denato*, 262 N.W.2d 281, 286 (Iowa 1978). The need to make a meaningful record exists because the reviewing court cannot predicate error upon speculation as to what testimony or evidence would have come in the record had the objection not been sustained. *Id.* An offer of proof may take

various forms, including a statement of proposed evidence into the record, the examination of a witness outside of the jury's presence to establish what the witness's testimony would be, or a written statement outlining the proposed evidence. *See Arnold v. Livingstone*, 134 N.W. 101, 103 (Iowa 1912). What is important is that the offer of proof creates a clear record that fully informs both the trial court and the reviewing court, and invites neither confusion nor speculation on the part of either. *See Brooks v. Holtz*, 661 N.W.2d 526, 529–30 (Iowa 2003) (discussing the sufficiency of an offer of proof consisting of a complete and unredacted copy of a letter, where only portions of the letter were sought to be admitted).

However, when a district court rules on a motion in limine in such a way that "it is beyond question whether or not the challenged evidence will be admitted during trial," the parties no longer have any reason to take such action in order to preserve error. *Tangie*, 616 N.W.2d at 568–69. Such unequivocal rulings, declaring evidence either admissible or inadmissible, generally constitute final rulings and need not be questioned again during trial. *State v. Alberts*, 722 N.W.2d 402, 406 (Iowa 2006).

The State alleges the district court's motion in limine ruling related to the iPod messages did not amount to a final ruling because it only prohibited prejudicial reference to the sexual nature of the communications and because the court intended for the ruling to be preliminary and subject to change at trial. Thus, the State argues, because Embree never made an attempt to present the messages to the district court as an offer of proof during his criminal trial, the court never had the opportunity to issue a final ruling on the admissibility of the

full set of iPod messages, and Embree forfeited any ability to complain about their exclusion at trial.

The morning of trial, the court discussed with counsel the State's motion in limine seeking to exclude mention of "an alleged sexual relationship between [J.S.] and [A.R.]." The State based its motion in limine both upon a general argument that the evidence was not relevant, presumably pursuant to Iowa Rules of Evidence 5.401 and 5.402, and also on a more specific argument that the evidence would violate the so-called "rape shield" law, as codified in Iowa Rule of Evidence 5.412. Embree responded with a last-minute pretrial motion of his own wherein he set forth his position that the sexual iPod messages between J.S. and A.R. were relevant in that they were necessary to understand J.S.'s motivation to make a false accusation against him, and that even if the evidence generally fell within the ambit of the rape shield law, then a specific subsection of the rule still allowed for the evidence to be introduced. His motion was accompanied by a pleading captioned "offer of proof" that listed the iPod with messages, detailing the sexual conversations between the two teens, and a disk that might have contained a compilation of the messages. However, Embree did not attach the listed items to the "offer of proof," and as a result, we have no record before us showing the messages that he intended to offer. Nor are we presented with the foundation he intended to present for their admission.

The court addressed the two motions by way of an oral ruling. With regard to Embree's offer of proof, the district court and Embree's counsel had the following exchange:

THE COURT: All right. All right. Anything else you want to say on your offer of proof, [counsel], which I think relates to the State's Motion in Limine?

EMBREE'S COUNSEL: Yes, Your Honor. I have some items because they were not made as transcript. I got the Motion in Limine yesterday, so I prepared my answer, will file it this morning. I have—I have an iPod. I have a disk from an iPod. I have some sections of—

THE COURT: Well, I understand that because that's in your offer of proof.

COUNSEL: Yes.

The court then proceeded to grant the State's motion in limine. Although the court only explicitly ruled on the State's motion, in doing so it effectively ruled on Embree's motion in limine as simply a request for opposite relief. The oral ruling was as follows:

THE COURT: I'm going to grant the State's Motion in Limine at this point. The issue of the taking of the iPod and the use of the iPod, if that was an issue that happened within the home, [Embree's counsel], that you want to allege is the reason, I take it, for the alleged victim here to be angry with your client, um, that's okay. But prior sexual conduct of this victim is not coming into this trial under any circumstances. When we get closer, if you want to make more of a proffer with your witnesses, we'll take time to do that. But that's my preliminary ruling, so unless and until I change it, there will be no commentary in voir dire, in opening, in cross-examination or in direct testimony of the victim's alleged prior sexual conduct or comments, particularly if they happen before the date of this incident. Any questions about my ruling?

EMBREE'S COUNSEL: Are you talking about the specific date the 11th of June or—

THE COURT: I'm talking about anything other than what happened between your client and this girl. So if it's a boyfriend or pictures she looked at online, none of that is going to come into this trial unless I change my ruling based upon something I hear later. Questions about that?

EMBREE'S COUNSEL: No.

The State is correct that at that juncture, the court had couched its ruling as preliminary and had reserved final ruling until a later time. The court invited Embree's counsel to "make a proffer at a later time." But when the issue was

raised again Embree's attorney presented argument but no offer of proof. The court ruled, based on what was in the minutes of testimony, saying:

> THE COURT: I ruled, and I continue to rule, that you're not to talk about this child's alleged sexual experiences, statements, texts, with anyone. She was a teenager. It wouldn't surprise me that any teenager anymore would be thinking about, talking about sexual issues. That's not the issue in this case. The issue is whether or not your client exposed himself in front of her. And just because he wants to bring that issue in as a possible defense doesn't mean it's admissible. So as we talked about earlier, if part of the defense is that there was some discipline or some action taken or somebody allegedly—this child allegedly caught in misbehavior that caused some problems within the home, if you want to construct that into a theory that that's why she made up allegations, that's typical. I think you're entitled to do that. But you're not going to talk about the details. It's not going to happen. So no witness, and your client, if he testifies, is not going to testify about, from what I read about in the Minutes, about the fact that he caught her in all these texts. . . . So the bottom line, it's we're not going to get into this child's alleged sexual history, period, not with her, not with any other witness. Anything I need to clarify about that?
>
> . . . .
>
> EMBREE'S COUNSEL: I understand that. But the problem is you don't want me asking the questions as well as that.
>
> THE COURT: I said—I didn't say I don't want you to. I said you're not going to. There's a big difference. You're not going to talk about this child's alleged sexual history.
>
> . . . .
>
> THE COURT: I'm not trying to constrain your defense if the defense is in part or in whole that Mr. Embree as a parental figure has caught a child in some alleged misbehavior or was calling her on it or trying to impose some consequences, and that either the allegation expressed or the inference you'd like for the jury to draw is that she was upset, and her allegations were motivated by anger or revenge or deflection. Whatever that argument may be, that's your argument to me. I am in no way trying to constrain that defense. What I'm saying, as a part of that defense the reasons why that issue came up to the extent that they relate to alleged sexual statements, behaviors or activities or thoughts of this child are a hundred percent off limits. Just like there's plenty of ways to talk to a witness about something that was found or something that happened without going into the details of it. So that's what my ruling is. It happens all the time. So you can deal with the issue

head on, but you have to avoid the content that led to the dispute—or the alleged dispute.

> EMBREE'S COUNSEL: Even if it's—

> THE COURT: If it's sexual.

> . . . .

> THE COURT: It may not be close to sexual. I mean, if it's, "I took Mom's iPod or iPad," or whatever it is, that's obviously not sexual. What was allegedly found on the iPad or the iPod to the extent that it was—that your client claimed it was sexual or that, or that you have evidence it was sexual, that's not coming in.

At that point, the court's ruling on the issue was no longer a preliminary one.

The record does not reveal what specific evidence contained on the iPod Embree sought to introduce. In raising the issue before the court, Embree's counsel spoke of an offer of proof regarding an "Exhibit A" consisting of "approximately 50 statements." But the two-page Exhibit A in the record does not contain sexually explicit messages nor is there any exhibit with fifty statements.

Standing alone, neither the statement "I have an iPod" nor the statement "I have Defendant's Exhibit A, which is approximately 50 statements from [J.S.'s] phone" is sufficient to create a meaningful record for appellate review, which is the purpose of an offer of proof. We are left to speculate as to the content of Embree's proposed evidence and the witness or witnesses he would present to offer the evidence. The record simply does not support the conclusion that he preserved error on the ruling for appellate review.

Embree's failure to preserve the issue of the denial of his defense by the trial court makes it unnecessary to rule on the remaining challenges raised by the State to the adequacy of Embree's claimed constitutional basis for his argument.

We next turn to his alternative arguments regarding the effectiveness of his counsel.

## B. Ineffective-Assistance-of-Counsel Claims

Embree claims trial counsel provided ineffective assistance of counsel in several respects. When a claim of ineffective assistance of counsel is raised on direct appeal, an appellate court may either "decide the record is adequate to decide the claim or may choose to preserve the claim for [postconviction proceedings]." Iowa Code § 814.7(3). In order to prevail on his claim of ineffective assistance of counsel, Embree must establish both that "(1) his trial counsel failed to perform an essential duty, and (2) this failure resulted in prejudice." *Straw*, 709 N.W.2d at 133 (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). Both elements must be proved by a preponderance of the evidence. *Id.*

With respect to the first prong, "we begin with the presumption that the attorney performed competently," and "avoid second-guessing and hindsight." *Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001). Furthermore, attorney action (or inaction) caused by improvident trial strategy, miscalculated tactics, or mistakes in judgment does not necessarily amount to ineffective assistance of counsel. *See State v. Ondayog*, 722 N.W.2d 778, 786 (Iowa 2006).

Embree must also show that counsel's error caused prejudice. *Ledezma*, 626 N.W.2d at 143. In order to show prejudice, he must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "We can resolve ineffective-

assistance-of-counsel claims under either prong of the analysis." *State v. Ambrose*, 861 N.W.2d 550, 556 (Iowa 2015).

Because Embree argues his counsel was ineffective in several respects, including one raised for the first time in his reply brief,[1] we conclude the record is not adequate to address his allegations. *See State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012) ("We will resolve the claims on direct appeal only when the record is adequate."). We preserve his ineffectiveness claims for possible postconviction proceedings.

**AFFIRMED.**

---

[1] Embree's proposes "better articulation" of one of his ineffectiveness claims in his reply brief—that his counsel was ineffective for having failed to make an adequate record regarding the electronic communications and the legal defense he wished to put forth. That argument raises an issue separate and distinct from the one originally set forth on appeal. *See State v. Carroll*, 767 N.W.2d 638, 644 (Iowa 2009) (noting we will not consider issues raised for the first time in a reply brief).