# IN THE SUPREME COURT OF IOWA

No. 09–1151

Filed September 23, 2011

**QUAD CITY BANK & TRUST,**

Appellant,

vs.

**JIM KIRCHER & ASSOCIATES, P.C.,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Dubuque County, Lawrence H. Fautsch, Judge.

An accounting firm seeks further review of a court of appeals decision granting a bank a new trial. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Robert V.P. Waterman, Jr., and Thomas D. Waterman (until withdrawal) of Lane & Waterman LLP, Davenport, for appellant.

Les V. Reddick of Kane, Norby & Reddick, P.C., Dubuque, for appellee.

**WIGGINS, Justice.**

A bank attempted to prove an accounting negligence claim by using an expert witness to testify regarding the accountant's audit of a company. The district court refused to allow the expert to testify as to generally accepted Certified Public Accountant (CPA) auditing standards, whether the accountant breached those standards, and causation. The district court left open the question of whether the expert could testify as to the accountant's work papers. At trial, the bank made an offer of proof as to the work papers, but did not move to introduce them, so the court never ruled on their admissibility. The bank received an adverse jury verdict and appealed. We transferred the case to the court of appeals. The court of appeals reversed the district court and remanded for a new trial. On further review, we hold the bank failed to preserve error on the work-paper issue. Additionally, we hold the expert was not qualified to testify as to generally accepted CPA auditing standards, whether the accountant breached those standards, and causation. Therefore, we vacate the decision of the court of appeals and affirm the judgment of the district court.

## I. Background Facts and Proceedings.

Keith Chapman owned Chapman Lumber Company, Inc., a lumber business located in Hopkinton. In February 2003 Quad City Bank & Trust (QCBT) provided Chapman Lumber with a $500,000 line of credit. In July QCBT loaned Chapman Lumber $1,935,000. The United States Department of Agriculture (USDA) guaranteed eighty percent of this loan. In September QCBT increased Chapman Lumber's line of credit to $750,000. As of October QCBT was aware Chapman Lumber defaulted on the $1,935,000 loan. Nevertheless, QCBT decided not to foreclose on the loan at that time.

As a condition of its guarantee, the USDA required a general audit of Chapman Lumber. Accordingly, on October 1 Chapman Lumber hired Jim Kircher & Associates, P.C. to perform a general audit for its fiscal year ending on June 30, 2003. According to Kircher, the objective of the audit was to express "an opinion about whether [Chapman Lumber's] financial statements [were] fairly presented in all material respects, in conformity with U.S. generally accepted accounting principles." Brian Feltes, a CPA and employee of Kircher, performed the audit. QCBT relied on the audit to validate Chapman Lumber's financial performance and to decide whether to keep working with Chapman Lumber. In late December QCBT saw a preliminary version of the audit report. Kircher did not issue the final report until late January 2004. The audit showed that, for fiscal year 2003, Chapman Lumber had overdrafts of $59,474 and a deficit cash flow of $85,306.

By the end of January, Chapman Lumber was also in default on the $750,000 line of credit. Subsequently, QCBT informed Chapman Lumber that they had thirty days to acquire an infusion of venture capital or QCBT would foreclose on the loans. However, rather than foreclosing on the loans after the thirty days expired, QCBT entered into a forbearance agreement with Chapman Lumber. The agreement provided that QCBT would not foreclose on its loans as long as Chapman Lumber procured an injection of venture capital.

In April Chapman Lumber suffered a substantial fire that destroyed its kilns, which were central to its operations. These events left QCBT with a decision. It could either recoup the insurance proceeds and liquidate Chapman Lumber or reinvest the proceeds into the business and keep Chapman Lumber operational. QCBT chose to keep Chapman Lumber operational due to the increased efficiency from newly

installed kilns and the expectation that Chapman Lumber would receive a substantial venture capital investment. While it was waiting for the insurance proceeds, Chapman Lumber procured a short-term loan of $150,000 from QCBT to be paid back in ninety days.

In January 2005 the forbearance agreement expired. Chapman Lumber had not yet secured a venture capital investment. Thus, QCBT called its loans with Chapman Lumber due. Subsequently, Chapman Lumber filed for bankruptcy protection. In March QCBT went to Chapman Lumber's premises to check on its collateral. During this check, QCBT discovered that Chapman Lumber had been defrauding the bank. QCBT found inventory at the facility, but Chapman Lumber did not own the inventory. Following this discovery, QCBT made a concerted effort to investigate Chapman Lumber's finances. QCBT learned that Keith Chapman had a personal Wells Fargo bank account through which he funneled approximately $600,000 of the company's money for his own personal expenses. Ultimately, QCBT netted $1,289,213 from Chapman Lumber's liquidation.

QCBT filed an accounting negligence claim against Kircher. QCBT alleged that Kircher negligently performed its fiscal-year-2003 audit of Chapman Lumber because it failed to discover and accurately convey the true financial condition of Chapman Lumber. QCBT claimed it relied on Kircher's audit when it delayed foreclosure on its loans with Chapman Lumber and, if it had known of the company's lack of inventory and fraud, it would have liquidated the company at the time of the fire. Furthermore, QCBT asserted that, had it liquidated in 2004 at the time of the fire, it would have netted $912,270.10 more than the $1,289,213 it netted in the 2005 liquidation.

QCBT identified Kerry Bolt as an expert witness. Bolt was a certified fraud examiner, but not a CPA. Bolt began his career as a revenue agent for the Internal Revenue Service (IRS), where he conducted field audits of income tax returns of individuals and businesses. Bolt then became an IRS special agent and conducted criminal investigations of income tax fraud, money laundering, and terrorist financing. Subsequently, he retired from the IRS and started a forensic accounting business. In relation to this case, Bolt reviewed all of Feltes's work papers, as well as other records, to determine whether Feltes sufficiently examined Chapman Lumber's internal controls, inventory, and risk of fraud.

Thirteen days before trial, Kircher filed a motion in limine seeking to prohibit QCBT from introducing "any evidence from plaintiff's designated expert Kerry Bolt with respect to standards of care applicable to certified public accountants, whether that standard was breached, or causation" and "any evidence from Kerry Bolt based upon his perceived errors in [Feltes's] work papers." Kircher pointed to Bolt's deposition testimony as proof that he was unqualified to opine on whether Kircher performed the audit according to generally accepted auditing standards. In his deposition, Bolt testified he was not a CPA, had never performed a general audit of a business, and was not familiar with CPA auditing standards.

QCBT resisted the motion, arguing Bolt was qualified to opine that Feltes failed to meet generally accepted auditing standards by failing to adhere to the work papers. QCBT claimed that because Feltes admitted in his deposition that the generally accepted auditing standards required him to complete the work papers, Bolt could analyze Feltes's work

contained in the work papers to assure he did everything the work papers required.

The district court held a hearing on the motion in limine on the first morning of the trial. QCBT argued that Feltes and Kircher's expert stated that the way you comply with the applicable professional CPA standards of care is to do as the work papers direct. Thus, QCBT argued:

> Bolt is not coming in as a typical expert to say the standard of care for a certified public accountant doing an audit is the following GAAP and GAAS standard was violated. He's coming in to say, I'm assuming that you have to do what your work papers told you to do and here's why that can't have been the case, and he is qualified to do that because he's a certified fraud examiner and he's been running down situations somewhat similar to this for a long time.

Accordingly, while QCBT agreed that Bolt was not qualified to testify as to whether Kircher performed the audit negligently, it claimed Bolt could testify as to whether Feltes did what the work papers required, assuming the audit was supposed to be conducted pursuant to the work papers. Kircher claimed this was a backdoor attempt to prove an auditor's professional negligence with an unqualified expert.

The court then ruled on Kircher's motion in limine:

> Plaintiff must still prove a violation of some generally accepted auditing standard, and from what I'm able to read from what has been given to me thus far in depositions of Mr. Bolt, he is not an expert who can determine whether or not an audit has been performed pursuant to some generally accepted auditing standard because he's not a CPA . . . . So I don't think that you can take a statement that was made by a CPA and then bring Mr. Bolt into the picture and say, well, based upon what he told me and then based upon other investigations that I made, I'm of the opinion that . . . this audit was not performed negligently . . . . I'm not saying right off the top of my head, I guess, that Mr. Bolt cannot testify period, but I'm just saying that he can't testify to this ultimate fact. And I really can't say . . . at this stage what my opinion would be in that regard because I just—with the

fluidity of the trial process, it's very hard for me to try to figure out how this is all going to come out.

After this statement, Kircher asked for clarification on the court's ruling, to which the court replied, "Your motion is granted as to Bolt." QCBT then stated the court's ruling left in doubt whether it could ask Bolt about the contents of the work papers and whether the work papers accurately reflected what actually happened. QCBT suggested the parties could resolve this issue with an offer of proof of Bolt's testimony outside the presence of the jury. QCBT never made a pretrial offer of proof, and the trial commenced.

At the close of its case, QCBT called Bolt to testify in an offer of proof. Bolt stated he was prepared to testify about his credentials and his review of Feltes's work papers. He was further prepared to testify as to whether the tasks outlined by the work papers had actually been performed by Feltes and the inadequacies of Feltes's inquiries and conclusions as to Chapman Lumber's internal controls, inventory, and potential fraud. At the close of the offer of proof, QCBT stated, "That's all I have at this time . . . . I think that's it. Thank you." QCBT did not renew its request to present Bolt's testimony or elicit a further ruling from the court as to the admissibility of Bolt's proffered testimony. Subsequently, the jury returned a verdict finding Kircher did not negligently perform the fiscal-year-2003 audit of Chapman Lumber.

QCBT moved for a new trial, arguing the court improperly excluded its sole expert witness, Bolt, from testifying at trial. The court denied the motion, stating that it did not completely exclude Bolt from testifying at trial, "but rather determined that Mr. Bolt was not qualified to give an opinion as to the standard of care applicable to accountants performing

general audits." QCBT filed a notice of appeal.[1] We transferred the case to the court of appeals.

The court of appeals reversed the judgment of the district court and remanded the case for a new trial. The court held QCBT properly preserved error because the court's ruling on the motion in limine was definitive. As for the merits, the court held Bolt was qualified to testify that Feltes failed to follow the work papers and perform all of the required interviews and inventory checks.

## II. Issues.

Kircher raises two issues on appeal. The first deals with error preservation while the second deals with whether Bolt was qualified to testify as to generally accepted CPA auditing standards, whether the accountant breached those standards, and causation.

## III. Error Preservation.

A ruling sustaining a motion in limine is generally not an evidentiary ruling. *Twyford v. Weber*, 220 N.W.2d 919, 923 (Iowa 1974). Rather, a ruling sustaining a motion in limine simply adds a procedural step to the introduction of allegedly objectionable evidence. *Id.*; *accord Johnson v. Interstate Power Co.*, 481 N.W.2d 310, 317 (Iowa 1992) (recognizing a ruling sustaining a motion in limine "merely adds a procedural step to the offer of evidence [and that i]f the evidence is not offered, there is nothing preserved to review on appeal"). Thus, a motion in limine "serves the useful purpose of raising and pointing out before trial certain evidentiary rulings the court may be called upon to make during the course of the trial" and, if sustained, excludes reference or introduction of this evidence until its admissibility is determined by the trial court, outside the presence of a jury, in an offer of proof. *Twyford*,

[1]We note that appellate counsel did not serve as trial counsel.

220 N.W.2d at 922–23 (recognizing further that the offer of proof allows the aggrieved party to present a proper record for review on appeal and, in the absence of such an offer, error may not be preserved).

The abovementioned rules regarding a motion in limine serve as the basis for the rule that "error claimed in a court's ruling on a motion in limine is waived unless a timely objection is made when the evidence is offered at trial." *State v. Alberts*, 722 N.W.2d 402, 406 (Iowa 2006) (quoting *State v. Tangie*, 616 N.W.2d 564, 568 (Iowa 2000)) (internal quotation marks omitted); *accord Simkins v. City of Davenport*, 232 N.W.2d 561, 565 (Iowa 1975). This is because the error only occurs, if at all, when the evidence is offered at trial and is either admitted or refused. *State v. Langley*, 265 N.W.2d 718, 720 (Iowa 1978) (recognizing further, normally "the ruling is not a final one; it is a red flag to counsel that the evidence is not to be brought before the jury unless and until it is separately taken up with the court . . . at trial"). There is, however, an exception to this general rule. When the court's ruling on a motion in limine leaves no question that the challenged evidence will or will not be admitted at trial, counsel need not renew its objection to the evidence at trial to preserve error. *Alberts*, 722 N.W.2d at 406; *State v. Miller*, 229 N.W.2d 762, 768 (Iowa 1975). "In such a situation, the decision on the motion has the effect of [an evidentiary] ruling." *Tangie*, 616 N.W.2d at 569 (quoting *Miller*, 229 N.W.2d at 768) (internal quotation marks omitted).

The key to deciding whether the general rule or the exception applies in a given case is determining what the trial court purported to do in its ruling. *Alberts*, 722 N.W.2d at 406. As we have recognized:

> "A ruling only granting or denying protection from prejudicial references to challenged evidence cannot preserve the inadmissibility issue for appellate review." However, "if the

> ruling reaches the ultimate issue [of admissibility] and declares the evidence admissible or inadmissible, it is ordinarily a final ruling and need not be questioned again during trial [to preserve error]."

*Id.* (quoting *State v. O'Connell*, 275 N.W.2d 197, 202 (Iowa 1979)). *Compare State v. Daly*, 623 N.W.2d 799, 800 (Iowa 2001) (holding that an exception to the general rule applied when counsel asked the court whether its ruling was the final order of the court and the court responded, "yes"), *with Johnson*, 481 N.W.2d at 316–17 (holding the general rule applied, and error was not preserved, when the court's ruling merely prohibited a party from mentioning the challenged evidence without first obtaining permission from the court outside the presence of the jury). Accordingly, to determine whether QCBT properly preserved error on the issue of the admissibility of Bolt's testimony, we first must determine the intent of the district court ruling on Kircher's motion in limine.

Kircher's motion in limine sought to prohibit Bolt from giving testimony concerning the standards of care applicable to certified public accountants, whether Kircher breached those standards, and causation, as well as any perceived errors in the audit's work papers. In ruling on the motion, the district court concluded Bolt was not qualified to testify as to whether Kircher performed the audit pursuant to generally accepted auditing standards. The court then ruled, "Your motion is granted as to Bolt." Subsequently, QCBT inquired whether the court's ruling precluded Bolt from testifying about the work papers. The court did not explicitly make a ruling on Bolt's testimony concerning the work papers. The court stated it was not prepared to rule on Bolt's analysis of the work papers at the beginning of the trial. The court also stated it

had no problem with QCBT mentioning inconsistencies and inaccuracies in the work papers in its opening statement.

The record clearly establishes the court's ruling on the motion in limine declared that Bolt's testimony concerning generally accepted CPA auditing standards, whether Kircher breached those standards, and causation, was inadmissible. The court did not equivocate or state it would reconsider its ruling at trial. *Cf. Holst v. Countryside Enters., Inc.*, 14 F.3d 1319, 1323 (8th Cir. 1994) (holding that a party failed to preserve error by not pursuing a ruling at trial where the court's motion in limine ruling invited the party to attempt to admit the evidence during trial). Thus, as to this testimony, we conclude the exception to the general rule applies. *See, e.g., Alberts*, 722 N.W.2d at 407 (holding that the exception to the general rule applied even though the court did not specifically rule the evidence was inadmissible because the ruling was definitive and reached the ultimate issue of admissibility). Accordingly, the court's ruling had the effect of a definitive evidentiary ruling. Thus, there was no need for QCBT to renew its request to present Bolt's testimony concerning generally accepted CPA auditing standards, whether Kircher breached those standards, and causation at trial to preserve error on this testimony.

A question remains: what is the scope of the district court's definitive evidentiary ruling on Bolt's proposed expert testimony regarding the work papers? QCBT argues the court's definitive ruling broadly prohibited Bolt from giving any meaningful testimony, including any testimony concerning the inaccuracy and inadequacy of the work papers. Therefore, QCBT claims it properly preserved error on the court's ruling as to any of Bolt's testimony. Conversely, Kircher claims the court's definitive ruling was limited to Bolt's testimony concerning

generally accepted CPA auditing standards, whether Kircher breached those standards, and causation. Kircher asserts the court's ruling did not reach other issues to which Bolt may have testified, including the work papers. Accordingly, Kircher claims QCBT failed to preserve error on the areas of Bolt's testimony that were outside the scope of the court's ruling because QCBT never renewed its request to present Bolt's testimony on these other issues at trial.

In its ruling on the motion in limine, the court appeared to equivocate on the all-encompassing nature of its ruling on the admissibility of Bolt's testimony. After the court's ruling, QCBT asked the court whether its ruling precluded Bolt from testifying about the work papers, and stated, "We might address that when Mr. Bolt's here outside the jury's presence and make a decision." The court failed to definitively rule on the admissibility of Bolt's testimony concerning the work papers, or other matters, at that time.

This exchange clearly establishes the court left open the question of whether QCBT could introduce Bolt's testimony as to other issues, including his analysis of the work papers, at trial. To preserve error on these issues, apart from the ultimate issues definitively ruled on by the court, QCBT was required to renew its request to present Bolt's testimony at trial and obtain a definitive ruling from the court.

At trial, the work papers were introduced into evidence without objection. At the close of its case, QCBT called Bolt to testify in an offer of proof. Following the offer of proof, QCBT did not renew its request to present Bolt's testimony or elicit a further ruling from the court as to the admissibility of Bolt's testimony on the work papers. When QCBT did not offer the testimony, Kircher did not lodge an objection to the

testimony contained in the offer of proof and the court never issued a final ruling on the admissibility of this testimony.

Thus, the general rule regarding error preservation for a motion in limine applies. Because QCBT did not offer the testimony contained in the offer of proof, the court never had a chance to rule on the admissibility of the evidence; therefore, QCBT failed to preserve error as to the admissibility of Bolt's testimony on the work papers and other issues unrelated to the ultimate issue of negligence. *See, e.g., Johnson*, 481 N.W.2d at 317 ("If the evidence is not offered, there is nothing preserved to review on appeal."); *State v. Delaney*, 526 N.W.2d 170, 177 (Iowa Ct. App. 1994) (holding error was not preserved where the court's ruling was not unequivocal and "whether the evidence offered by the State fell within the parameters of the ruling was uncertain").

**IV. The District Court's Ruling Concerning Generally Accepted CPA Auditing Standards, Whether Kircher Breached Those Standards, and Causation.**

QCBT properly preserved error on whether Bolt could testify as to generally accepted CPA auditing standards, whether Kircher breached those standards, and causation.

**A. Scope of Review.** We review the district court's determination of whether a witness may testify as an expert on a particular topic for an abuse of discretion. *Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 685 (Iowa 2010). An abuse of discretion occurs when the district court exercises its discretion on grounds or for reasons that are clearly untenable, or to an extent clearly unreasonable. *State v. Nelson*, 791 N.W.2d 414, 419 (Iowa 2010); *Graber v. City of Ankeny*, 616 N.W.2d 633, 638 (Iowa 2000). "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law." *Graber*, 616 N.W.2d at 638.

**B. Analysis.** We hold a liberal view on the admissibility of expert testimony in this state. *Ranes*, 778 N.W.2d at 685; *Leaf v. Goodyear Tire & Rubber Co.*, 590 N.W.2d 525, 531–32 (Iowa 1999). Iowa Rule of Evidence 5.702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Iowa R. Evid. 5.702. The party seeking to introduce the expert testimony has the burden of demonstrating to the court, as a preliminary question of law, that the expert is qualified and will present reliable opinion testimony. *Ranes*, 778 N.W.2d at 686; *see also* Iowa R. Evid. 5.104(*a*).

Rule 5.702 presents preliminary areas a court must consider before admitting expert testimony. *Ranes*, 778 N.W.2d at 685. First, the court must consider whether the expert's proposed testimony will "assist the trier of fact" in understanding "the evidence or to determine a fact in issue." Iowa R. Evid. 5.702.

Second, the court must determine whether the witness is qualified to testify as an expert "by knowledge, skill, experience, training, or education" on the subject matter in question. *Id.* "All expert witnesses must be qualified in the area of their testimony based on one of the five areas of qualification." *Ranes*, 778 N.W.2d at 687. However, the witness need not have a particular degree, license, or education. *Id.*; *Leaf*, 590 N.W.2d at 535 ("[N]o particular education is required; experience is sufficient to qualify a witness as an expert."); *Hutchison v. Am. Family Mut. Ins. Co.*, 514 N.W.2d 882, 886 (Iowa 1994) ("Although licensing carries a presumption of qualification to testify in the given field, 'learning and experience may provide the essential elements of

qualification.'" (quoting *Ganrud v. Smith,* 206 N.W.2d 311, 315 (Iowa 1973))).

Rule 5.702 does not impose a requirement for how an expert is to become qualified and does not distinguish between whether an expert is qualified or unqualified based on whether he or she belongs to a particular profession or has a particular degree. *Ranes,* 778 N.W.2d at 689; *see also Hutchison,* 514 N.W.2d at 888 (recognizing expertise acquired through experience is every bit as good as expertise acquired academically). Moreover, the witness does not need to be a specialist in the area of the testimony so long as the testimony is within the witness's general area of expertise. *Ranes,* 778 N.W.2d at 687. Finally, a court can only determine whether an expert is qualified by considering the expert's qualifications in the context of the issues to be determined by the trier of fact. *Id.*; *see also Hutchison,* 514 N.W.2d at 889 (recognizing that those who fail to meet the standards of rule 5.702 should not be allowed to testify even if they profess expertise on a subject). Accordingly, we must determine whether Bolt was qualified to testify as an expert in the areas concerning generally accepted CPA auditing standards, whether Kircher breached those standards, and causation.

An application of these principles is illustrated in *Garnac Grain Co. v. Blackley,* 932 F.2d 1563 (8th Cir. 1991). There, a grain company sought to introduce the opinion testimony of three expert witnesses that an accounting firm violated generally accepted auditing standards due to its failure to discover embezzlement. *Garnac Grain Co.,* 932 F.2d at 1565–66. The first proposed expert, the grain company's director of accounting, attended only one year of college, took only a few noncredit courses in auditing and accounting, and was not a CPA. *Id.* at 1566. The second proposed expert was the grain company's current president,

who possessed a business degree. *Id.* He also was not a CPA and had never taken a course in auditing or internal controls. *Id.* The final proposed expert was a retired professor who taught auditing courses for almost forty years, but had an expired CPA license. *Id.* at 1567. Under these facts, the Eighth Circuit held the first two proposed experts were unqualified to testify. *Id.* at 1566. The court acknowledged that practical knowledge and experience alone could provide an adequate basis for expert testimony. *Id.* However, the court held the "deposition testimony of these witnesses . . . indicates that their practical knowledge does not provide them with the requisite expertise in auditing or accounting" to opine on whether the accounting firm violated generally accepted auditing standards. *Id.* As for the third proposed expert, the court held his knowledge and experience "crosses the threshold of admissibility." *Id.* at 1567. Accordingly, the court found that any weaknesses in the third expert's opinion and expertise went to the weight of his testimony, not its admissibility. *Id.*

From Bolt's depositions and QCBT's arguments, the district court concluded Bolt "is not an expert who can determine whether or not an audit has been performed pursuant to some generally accepted auditing standard because he's not a CPA." While the district court's reasoning was flawed, its conclusion was correct. The fact that Bolt was not a CPA did not disqualify him from testifying on the ultimate issue of whether Kircher violated generally accepted accounting standards. *See, e.g.*, *Hutchison*, 514 N.W.2d at 886 (recognizing if a person is qualified by learning and experience, the lack of board certification or licensure goes to the weight of the expert's testimony, not its admissibility). Rather, Bolt was unqualified to testify on this issue because he lacked the

knowledge, skill, experience, training, or education to provide an adequate basis for this testimony.

Although Bolt had experience as an IRS revenue and special agent, Bolt did not have an accounting degree and was not a CPA. Even though Bolt was a certified fraud examiner, Bolt had never performed a certified audit. Moreover, while he claimed to be generally familiar with the standards applicable to CPAs and the auditing process, he stated his opinions with regard to Feltes's work were not based upon whether Feltes complied with generally accepted auditing standards. Instead, Bolt described his proposed testimony as follows:

> I looked at the work papers that [Feltes] prepared, which are the standardized forms that I can only assume he was required to fill out in every certified audit. I looked at those forms and the information that he put on there, compared them to the actual facts and what was going on at . . . Chapman Lumber Company.

Bolt confirmed he was not planning to testify that Feltes violated certain auditing standards because he did not specifically know each standard that was applied in the audit. Although Bolt believed Feltes should have conducted the audit differently, he could not testify that such conduct was required under generally accepted auditing standards. Bolt stated that he was not familiar with any of the standards developed for general application by the American Institute of Certified Public Accountants. Moreover, when asked how he would generally define the standard of care owed by CPA accounting firms in the practice of accounting, he stated, "Specifically, I don't know that answer."

At the hearing on the motion in limine, QCBT agreed that Bolt was not qualified to testify on the ultimate issue of whether Kircher performed the audit negligently. QCBT claimed Bolt would not testify about the appropriate standard of care for a CPA doing an audit or

explain that certain generally accepted accounting standards were violated. Rather, QCBT asserted Bolt would only testify as to his analysis of Feltes's work papers and how they varied from the actual facts in the case.

Just as in *Garnac Grain Co.,* Bolt's knowledge, skill, experience, training, or education did not provide him with the requisite expertise in auditing or accounting to opine on the ultimate issue of whether Kircher breached any generally accepted auditing standards. Accordingly, we conclude Bolt was unqualified to testify on this issue and the court did not abuse its discretion when it failed to allow his testimony.

### V.  Disposition.

We vacate the decision of the court of appeals and affirm the judgment of the district court because QCBT failed to preserve error on the issue as to whether its expert witness could testify concerning the accountant's work papers and the court did not abuse its discretion in ruling that QCBT's expert could not testify as to generally accepted CPA auditing standards, whether Kircher breached those standards, and causation.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except Waterman and Mansfield, JJ., who take no part.