# IN THE COURT OF APPEALS OF IOWA

No. 21-1852
Filed June 21, 2023

THE TIMELY MISSION NURSING HOME d/b/a TIMELY MISSION NURSING HOME and TIMELY MISSION,
        Plaintiff/Counterclaim Defendant-Appellant,

vs.

KATHY L. ARENDS and PATTI J. FIDERLICK, Individually and as Co-Executors of the ESTATE OF DARLENE WEAVER,
        Defendants/Counterclaim Plaintiffs-Appellees.
_____

        Appeal from the Iowa District Court for Winnebago County, James M. Drew,

Judge.


        Timely Mission appeals the district court's admission of certain evidence as

well as jury instructions. **REVERSED AND REMANDED.**


        Nancy J. Penner of Shuttleworth & Ingersoll, P.C., Cedar Rapids, and Troy

L. Booher (pro hac vice) of Zimmerman Booher, Salt Lake City, Utah, for appellant.

        Benjamin P. Long, Pressley Henningsen, Brian Ivers, and Laura Schultes

of RSH Legal, P.C., Cedar Rapids, for appellees.


        Heard en banc.

**GREER, Judge.**

The Timely Mission Nursing Home (Timely Mission) appeals the entry of a $6,000,000 verdict against them in favor of Kathy Arends and Patti Fiderlick, individually and as co-executors of the Estate of Darlene Weaver (collectively the Estate). Timely Mission argues the district court wrongly admitted evidence that was hearsay, unfairly prejudicial, and of prior bad acts; it also challenges the admission of state documents with findings of abuse. Finally, it challenges certain jury instructions it believes were not supported by the evidence. Because we find inadmissible evidence was admitted, we reverse and remand for a new trial.

**I. Background Facts and Prior Proceedings.**

Darlene Weaver moved into Timely Mission in July 2015 for nursing and memory care; among other things, she lived with dementia and Parkinson's disease and had a history of falling. When Weaver arrived at Timely Mission, a comprehensive assessment was done. This tool is meant to provide a full picture of the individual for appropriate care to be provided. Based on that tool, Timely Mission completed a fall assessment which was periodically updated. When Weaver first arrived, she had recently sustained a hip fracture and was designated a one-person assist, meaning she needed someone with her to help get her to the restroom or walk down the hall. But after six months, she was determined an independent ambulator and not a high fall risk.

In April 2017, while moving between her bed and the restroom, Weaver fell. According to Timely Mission's charting, she suffered no serious injury. No changes were made to Weaver's fall assessment. Then, in June of 2017, Weaver fell again

while moving between her bed and the restroom and fractured her left hip and shoulder. Less than a week later, she died of complications from the June fall.

Timely Mission filed a claim in Weaver's probate action for unpaid charges.[1] Then the Estate filed suit against Timely Mission in November 2017; the cases were consolidated, and the Estate eventually paid the remaining balance, leaving only the Estate's claims that Timely Mission's negligence, gross negligence, or recklessness caused Weaver's wrongful death; Timely Mission breached its contract with Weaver by failing to provide care commensurate with her needs; and dependent adult abuse. Additionally, Weaver's children claimed loss of consortium. The Estate sought punitive damages.

Along with allegations about Timely Mission's fall assessment of Weaver and fall-prevention measures, the Estate's argument focused on alleged abuse of Weaver and its impact on her health and willingness to ask for help. This specifically concerned one certified nursing assistant (CNA) at Timely Mission, Melanie Blakesley. Days before the fall, Arends called Timely Mission; the employee who took the call summarized in a note, entered as an exhibit at trial, that Arends did not want Blakesley caring for Weaver because, when Weaver had asked Blakesley for help, Blakesley had told Weaver to "help herself" because "she couldn't be [there] all of the time." The employee who took the call spoke with Weaver, who confirmed this concern. The Estate planned to elicit testimony that fear of staff at a nursing home can prevent residents from asking for help. They also presented witnesses, namely other CNAs or Timely Mission staff who had

---

[1] The bill was eventually paid in full in the midst of trial.

worked with Blakesley, who would testify they saw Blakesley physically and verbally abuse other residents. The Estate also planned to include documents from the Iowa Department of Inspections and Appeals (IDIA) that contained allegations of, investigations into, and findings of abuse at Timely Mission—some, but not all, involved Weaver as the victim.[2]

Ahead of trial, Timely Mission filed several motions in limine. One asked the district court to exclude evidence of complaints made to the IDIA that both did and did not involve Weaver. In another, it asked the district court to limit evidence about Blakesley's alleged physical and verbal abuse toward other residents as impermissible prior bad acts evidence and hearsay. A third sought to exclude evidence that Weaver fell because of "fear of Melanie Blakesley or Ms. Weaver's unwillingness to call for assistance."

The district court held a hearing on the motions and determined it would rule on IDIA evidence as it arose during trial. Further, it ruled that any evidence of physical abuse against Weaver was "obviously" admissible, but the admissibility of any evidence of such abuse against another resident would be determined at trial, so the Estate could only "refer to its contentions in a general sense" and not discuss specifics until the court could deem such evidence was admissible. And it overruled Timely Mission's request to exclude evidence about Weaver's fear of Blakesley and its consequences.

The issue of evidence of physical abuse arose during the Estate's opening statement. Outside of the presence of the jury, Timely Mission asserted that the

---

[2] Though the documents do not refer to residents by name, the details provided confirmed that one of the reports concerned Weaver.

references to physical abuse were "incurably prejudicial" and that there was "scant evidence—certainly not compelling evidence and not substantial—of any type of physical abuse occurring in this case." Realizing this would be a persistent issue, the district court offered Timely Mission a standing objection to references to physical abuse. Timely Mission declined, stating it would "have to watch and see."

Several individuals who were staff at Timely Mission while Weaver was a resident also testified. Darci Beck,[3] a CNA, testified that she received word from other residents that Blakesley was "rude" or would swear at them; she also testified she witnessed Blakesley swearing at residents and being aggressive during transfers.[4] Melissa Brandt, a charge nurse, testified she received complaints from other staff about Blakesley swearing at residents and being "physically rough." She also stated she had expressed concerns to Roberta Hagedorn, Timely Mission's Director of Nursing, about the staffing levels, specifically that they needed more CNAs. Paul Armstrong, the maintenance supervisor, also testified he heard concerns or "rumors" about Blakesley from the staff; he directed them to speak to Hagedorn. CNA Colleen Haugen testified she knew Blakesley was not allowed in certain rooms and had heard it was because she was rough with residents and swore at them; specifically, she heard this was why Blakesley was not allowed in Weaver's room for a period. She herself saw Blakesley yell "fuck" and "bitch" at Weaver and tell Weaver to "put her own shoes on." Haugen

---

[3] Beck gave similar testimony in a deposition, which was read to Lori Bierle, the corporate representative for Timely Mission, while taking her deposition. That portion of Bierle's video deposition was played for the jury.

[4] Testimony at trial showed that "transferring" refers to moving a patient from one position to another, such as from their bed to a chair or helping them stand.

intervened, asking Blakesley to leave the room, and then reported this information to the charge nurse. CNA Rita Thompson also testified she heard reports from other staff that Blakesley was being abusive toward residents and reported that information to the charge nurse. She also testified she found bruises on the back of Weaver's arms and the top of her shoulder, which she reported to the charge nurse. And finally, portions of facility administrator Stephanie Morris's deposition were read into evidence. Morris testified a state surveyor came to her and reported allegations Blakesley had verbally and physically abused some of the residents; after following up with staff, she determined that some allegations were founded and terminated Blakesley.

Following Brandt's testimony, again outside of the presence of the jury, the district court granted Timely Mission a standing objection to references to verbal and physical abuse of those other than Weaver. The district court specifically noted it was allowing the evidence in to show the abuse "was reported and there was not follow-up investigation," but not for the truth of the allegations.

In addition to the staff members, the Estate offered testimony from several expert witnesses. One, Byron Arbeit, was an expert in health care administration. He explained that, consistent with both state laws and Timely Mission's internal policies, all Timely Mission employees were required to report suspected abuse—including verbal or physical abuse—even if they did not see it occur. He also stated that, based on his review of the evidence in the case, Weaver had been verbally abused and potentially physically abused. Timely Mission objected to his initial statement, citing the earlier motion in limine—the district court overruled the objection. Arbeit explained that if a resident was abused, they would feel

threatened, become withdrawn, and be less likely to ask for help. This was echoed by another expert presented by the Estate—Dr. Joyce Black, a nursing professor—who testified residents "can become fearful that they're going to get yelled at, and they can stop asking for help because they don't want to get yelled at."

Also during Arbeit's testimony, the Estate sought to ask him about the IDIA reports, including the one that originated after Weaver's death and concluded she had been abused. Timely Mission objected, stating the reports were both hearsay and evidence of prior bad acts. The district court limited the Estate to only the report that followed Arends's complaint; further restricted the testimony to refer to it as a report, but not a citation; and held Arbeit could not discuss specifics of the findings. The report itself, however, was not offered into evidence. Arbeit testified he regularly used state documents to develop his conclusions and that such practice was common in his field; here, he relied on the IDIA report and found it was consistent with his conclusions.

The Estate made a similar offer with Dr. Bruce Naughton. Following his conclusion that Weaver was abused, the Estate asked if Naughton had reviewed the IDIA documents and if they were consistent with his opinions and conclusion—Naughton responded that they were consistent. He also explained, when asked about abuse, that particularly for a patient with dementia:

> they're already in an institution where they don't want to be. They're not feeling any control. It's very easy for someone who you feel is not paying attention to you, is treating you as an object—it's devaluing. It—it can cause depression, anger. It's just—adds to the environment where you already feel trapped, not in control, that it makes that even worse.

8

Fiderlick testified that the last time she saw her mother, she seemed out of sorts—she described her as "quiet," "subdued," and "[j]ust not herself." She also recalled a conversation where her mother said someone at Timely Mission was being mean to her. Arends also testified about finding bruises on the backs of her mother's arms the April before her fall. She also testified that, as far back as 2016, Weaver expressed she was fearful of Blakesley, specifically that "she was afraid nobody would come and help her get dressed." Arends believed that "when [Weaver] asked for help, they wouldn't come help her." Arends testified that she told Timely Mission about her concerns and trusted it to keep Blakesley out of Weaver's room; she did not believe Blakesley was allowed in Weaver's room in June 2017 and repeated her wishes that Blakesley not care for Weaver when she heard Blakesley was in her room again.

After the close of evidence in the nine-day trial, Timely Mission moved for a directed verdict. It claimed the Estate failed to prove its prima facie case of physical and verbal abuse or introduce substantial evidence that Timely Mission caused Weaver's fall; it also argued the Estate had not offered substantial evidence necessary to support punitive damages due to the acts of Timely Mission employees. The district court denied the motion. Timely Mission then objected to the corresponding jury instructions, arguing certain specifications were not supported by the evidence, but the district court gave these challenged specifications to the jury.

The jury returned a verdict for the Estate, awarding $2,000,000 for Weaver's pre-death pain and suffering, $1,000,000 for pre-death loss of full mind and body, $500,000 each to Weaver's two children for loss of consortium, and $2,000,000 in

punitive damages. Timely Mission moved for a new trial and judgment notwithstanding the verdict. After a hearing on the motions, the district court denied both.

On appeal, Timely Mission argues the district court wrongly allowed the Estate to offer (1) hearsay evidence that Blakesley was verbally abusive to residents other than Weaver; (2) hearsay evidence that Blakesley was physically abusive to other residents; and (3) evidence from IDIA investigations. Timely Mission also argues the district court submitted claims not supported by the evidence to the jury, namely a negligent staffing claim and two punitive damages specifications.

## II. Standard of Review.

Our typical review of a district court decision to exclude or admit evidence, including decisions based on Iowa Rules of Evidence 5.403 and 5.404, is for an abuse of discretion. *Mohammed v. Otoadese*, 738 N.W.2d 628, 631 (Iowa 2007) (rule 5.403); *Kindig v. Newman*, 966 N.W.2d 310, 317 (Iowa Ct. App. 2021) (rule 5.404). "We reverse the district court's admission as an abuse of discretion when the grounds for admission were 'clearly untenable or clearly unreasonable.'" *Kindig*, 966 N.W.2d at 317 (citation omitted). "However, we review challenges to hearsay and other evidence implicating the interpretation of a rule of evidence for correction of errors at law." *Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261, 265 (Iowa 2019). "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." Iowa R. Evid. 5.103(a). But, "unless the record shows the contrary, we presume

improperly admitted hearsay evidence is prejudicial to the nonoffering party."
*Hawkins*, 929 N.W.2d at 265.

**III. Analysis.**

A. Evidence about Blakesley and Abuse.

Timely Mission challenges the following statements made by six witnesses about Blakesley and residents other than Weaver:

(1) Beck's testimony that residents told her Blakesley was rude, would not help them, or would swear at them; that she witnessed Blakesley swearing at other residents; and that she reported Blakesley for that behavior and aggressively transferring residents to the administrator and charge nurse;

(2) Brandt's testimony that other staff told her Blakesley had sworn at and been physically rough with residents;

(3) Armstrong's testimony he had other staff members tell him Blakesley was abusive;

(4) Haugen's testimony that she heard from "rumors and other employees" that Blakesley was physically rough with and would swear at residents;

(5) Thompson's testimony that other staff told her Blakesley was abusive and that she reported her concerns about Blakesley's behavior to the charge nurse; and

(6) Morris's testimony that an IDIA surveyor told her about reports that Blakesley "was being abusive to residents" and, upon investigation, was told by staff that Blakesley was verbally abusive and physically rough with a resident.

As to Blakesley and Weaver, Timely Mission also challenges Haugen's testimony that she was once told "at report" that Blakesley was not to go into

Weaver's room, that she was told by other aides that Blakesley was not allowed in Weaver's room because Blakesley was rough with Weaver, and that she saw and reported Blakesley swear at Weaver and refuse to help her.

Timely Mission argues, as it did at trial, that the statements should have been excluded as hearsay. And, as to the statements made about Blakesley's treatment of residents other than Weaver, it argues they were unfairly prejudicial and inadmissible evidence of prior bad acts.

i. Hearsay.

Iowa Rule of Evidence 5.802 excludes hearsay statements from evidence unless they fit into an established exception. Rule 5.801(c) defines hearsay as "a statement that: (1) The declarant does not make while testifying at the current trial or hearing; and (2) A party offers into evidence to prove the truth of the matter asserted in the statement."

*a. Error Preservation.*

The Estate disputes error preservation on statements made by Brandt about abuse toward residents other than Weaver, claiming that they were made before the standing objection was put in place.

"It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). But, "[o]ur issue preservation rules are not designed to be hypertechnical." *Griffin Pipe Prods. Co. v. Bd. of Rev.*, 789 N.W.2d 769, 772 (Iowa 2010). They exist to promote fairness because "[i]t is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider." *Otterberg v. Farm*

*Bureau Mut. Ins. Co.*, 696 N.W.2d 24, 28 (Iowa 2005) (alteration in original). In this case, when the district court discussed the standing objection, the Estate tried to specifically clarify that it would only apply going forward. The district court responded:

> Right, right. The record's made up to this point forward. But, again, I—And I don't want to re-create everything that's been said. But I—I know we've had some pretty in-depth conversations about this. And we talked about reasons previously urged in a motion in limine and whatnot. So I think it's been clear that Timely Mission has been objecting to testimony of any type of abuse with respect to other residents throughout the trial thus far.

Based on this discussion, it is clear that the district court had ample notice of the concern and repeatedly addressed this issue from the case's onset; we have no doubt the goals of error preservation were met. *Cf. Gacke v. Pork Xtra, L.L.C.*, 684 N.W.2d 168, 181 (Iowa 2004) ("This court has long held the view that 'once a proper objection has been urged and overruled, it is not required that repeated objections be made to questions calling for the same type of evidence.'" (citation omitted)), *overruled on other grounds by Garrison v. New Fashion Pork LLP*, 977 N.W.2d 67, 81–82 (Iowa 2022).

The Estate also challenges whether error was preserved as to statements made by Haugen about interactions with Weaver specifically. Timely Mission did not object to the statements at the time Haugen testified. Typically, the district court's ruling on a motion in limine is not an evidentiary ruling; "[t]his is because the error only occurs, if at all, when the evidence is offered at trial and is either admitted or refused." *Quad City Bank & Tr. v. Jim Kircher & Assocs., P.C.*, 804 N.W.2d 83, 89–90 (Iowa 2011). And if a motion in limine is denied, as it was here, "the resisting party must object at the time the evidence is offered at trial to

preserve a challenge to the evidence on appeal." *State v. Thoren*, 970 N.W.2d 611, 621 (Iowa 2022). But, "[w]hen the court's ruling on a motion in limine leaves no question that the challenged evidence will or will not be admitted at trial, counsel need not renew its objection to the evidence at trial to preserve error." *Quad City Bank & Tr.*, 804 N.W.2d at 90. "The key to deciding whether the general rule or the exception applies in a given case is determining what the trial court purported to do in its ruling." *Id.*

Timely Mission had already objected to statements of physical abuse perpetrated against Weaver in its third motion in limine—unlike the statements about interactions with other residents, which the court reserved ruling on, the district court expressly held: "Obviously, any evidence of physical or verbal abuse perpetrated against Darlene Weaver *is admissible*. To the extent Timely Mission's motion pertains to that evidence it is overruled." (Emphasis added). Because this qualified as a final ruling on admissibility and fits into the exception of this general rule, error was preserved without a contemporaneous objection to Haugen's testimony.

*b. Blakesley and Other Residents.*

The district court held the statements about Blakesley and other residents were not hearsay because they were not offered for their truth, but instead to show that suspected abuse "was reported [to Timely Mission] and there was no follow-up investigation." *See McElroy v. State*, 637 N.W.2d 488, 501 (Iowa 2001) ("[A] statement that would ordinarily be deemed hearsay is admissible if it is offered for a non-hearsay purpose that does not depend upon the truth of the facts presented.").

Timely Mission argues the above statements—except for Beck's testimony that she witnessed Blakesley swearing at and aggressively transferring other residents—were inadmissible hearsay evidence offered for their truth, pointing to our supreme court's holding in *Gacke*. In *Gacke*, a nuisance case against a hog confinement facility, the plaintiffs, prior to trial, "circulated questionnaires to various individuals who had been on or around the plaintiffs' property concerning the odors emanating from the defendant's confinement facilities. Twenty-three completed questionnaires were admitted at trial over the defendant's hearsay objection." 684 N.W.2d at 181. Similar to the argument here, the plaintiffs claimed the questionnaires were not offered for their truth, but to show that "the defendant [was] on notice of an odor problem [which] rendered the defendant's subsequent failure to take remedial action unreasonable." The supreme court stated on appeal that, counter to plaintiff's argument, these questionnaires were offered for their truth because

> the reasonableness of the defendant's inaction [was] dependent on whether an odor problem actually existed. In other words, if the statements made by the questionnaire respondents that there were severe odors coming from the defendant's facilities were untrue, the defendant's inaction would not be unreasonable. Thus, the probative value of the questionnaire statements depends on the truth of those statements.

*Id.* at 182.

The Estate argues this case is distinguishable from *Gacke* because unlike the hog confinement facility, where behavior was premised on the truth of the concerns, testimony at trial showed that Timely Mission staff members were mandatory reporters; and, according to Timely Mission's internal policy, "[a]s a mandatory reporter, if an employee suspect[ed] or witness[ed] the potential abuse

of a resident, they must notify the person in charge or the person's designated agent who shall notify the [IDIA] within 24 hours of such notification." In other words, action was to be taken when there was an allegation regardless of whether or not that allegation was true. We agree that *Gacke* can be distinguished but not in a manner that is helpful to the Estate. Unlike the detail from the questionnaires in *Gacke*, here the evidence of alleged abuse came from unknown staff about non-specific details against unnamed residents. On this record, the Estate could not reliably show foundational support that the prior incidents occurred under substantially the same circumstances. *See McClure v. Walgreen Co.*, 613 N.W.2d 225, 234 (Iowa 2000). To satisfy the failure-to-investigate theory, the Estate must show more than rumors. The Estate argues the evidence was offered to prove the "pattern of reports" that Timely Mission received but failed to investigate. But, based on this record we cannot say if the rumors all relate back to one incident or many incidents. Plus, although the Estate argues the evidence was not offered to show that Blakesley abused residents, that is exactly how the information was used by the Estate during closing arguments.

Taking another approach, the Estate argues this evidence should have been admitted for its truth regardless because the statements offered against Timely Mission were made by Timely Mission's "employee[s] on a matter within the scope of that relationship and while it existed," excluding them from the bar on hearsay under Iowa Rule of Evidence 5.801(d)(2)(D). This rule clearly does not apply to certain statements: part of Beck's testimony was about what she heard from *residents* and Morris's testimony was about what she was told by an *IDIA surveyor*. To begin with, these statements are hearsay within hearsay, which is

16

admissible only if each level of hearsay is admissible by some exception to the exclusionary rule. Iowa R. Evid. 5.805. But focusing just on the residents and the surveyor, these statements were not made by agents or employees of Timely Mission. The offering party bears the burden of "showing that the declarant was speaking within the scope of that person's agency in order to establish a vicarious admission under Iowa Rule of Evidence 801(d)(2)(D)." *Annear v. State*, 454 N.W.2d 869, 873 (Iowa 1990); *accord Ceaser v. Marshalltown Med. & Surgical Ctr.*, No. 18-2101, 2020 WL 1310299, at *2 (Iowa Ct. App. Mar. 18, 2020). "[A]n act is deemed to be within the scope of one's employment 'where such act is necessary to accomplish the purpose of the employment and is intended for such purpose.'" *Godar v. Edwards*, 588 N.W.2d 701, 705 (Iowa 1999) (citation omitted); *accord Ceaser*, 2020 WL 1310299, at *2. And, regarding the rest of the statements at issue, there was no explicit foundation laid at trial that any of the statements were necessary for employment and made for that purpose. While information could be passed between colleagues to ensure proper care, because we do not know the identity of those making the statements there is nothing in this record to assure us these unnamed staff members were speaking within the scope of their employment or even what purpose existed behind the spread of the rumors. Thus, these statements related to unknown employees were inadmissible hearsay that should not have been allowed into evidence.

Because these statements were inadmissible hearsay, we presume prejudice. *Hawkins*, 929 N.W.2d at 265. And, "[w]hen inadmissible hearsay evidence directly addresses a hotly contested central dispute of the parties, it is harder for us to find the evidence nonprejudicial." Here, abuse was a central theme

of the Estate's case. While there was direct evidence of individuals seeing isolated incidents of abuse by Blakesley, Timely Mission's culture and understanding surrounding the abuse is a broader issue. Given the hot-button nature of the issue, we find Timely Mission was prejudiced. Therefore, we reverse the verdict and remand for a new trial. *See id.* at 267. But, because we find other reasons to remand for new trial and there are other issues that will likely arise in that new trial, we address the other evidentiary concerns as well. *See Zaw v. Birusingh*, 974 N.W.2d 140, 168 (Iowa Ct. App. 2021) ("Because we find the case must be remanded for a new trial, we will consider any remaining issues that may arise again on retrial." (citation omitted)).

*c. Blakesley and Weaver.*

As to Haugen's testimony about Blakesley and Weaver, we find they were not inadmissible hearsay. Blakesley's swear words directed at Weaver—"fuck" and "bitch"—were not offered for whatever "truth" the words held, but instead to show the tenor of the conversation and their impact on Weaver. As to the whole interaction, it was established that this occurred while Blakesley was working at Timely Mission and actively working with a resident, which "was necessary to accomplish the purpose of the employment and is intended for such purpose." *See Godar*, 588 N.W.2d at 705. The same can be said of Haugen's report of the behavior, as stated above. So, under rule 5.801(d)(2)(D), it is excluded from the definition of hearsay and its admission is not reversible error.

ii. Unfair Prejudice.

Next, Timely Mission argues the abuse evidence about Blakesley and other residents was unfairly prejudicial.[5] Iowa Rule of Evidence 5.403 gives the court discretion to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ." First, the court determines the probative value of the evidence; that probative value is then balanced "against the danger of its prejudicial or wrongful effect upon the triers of fact." *State v. Lacey*, 968 N.W.2d 792, 807 (Iowa 2021) (citation omitted). "Unfair prejudice arises when the evidence prompts the jury to make a decision on an improper basis, often an emotional one." *Pexa v. Auto Owners Ins. Co.*, 686 N.W.2d 150, 158 (Iowa 2004) (citation omitted); *accord State v. Plaster*, 424 N.W.2d 226, 231 (Iowa 1988) (noting unfairly prejudicial evidence "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action may cause a jury to base its decision on something other than the established propositions in the case"). But, "[t]he adverse effect of relevant evidence due to its probative value is not unfair prejudice." *Pexa*, 686 N.W.2d at 158–59. "Because the weighing of probative value against probable prejudice is not an exact science, we give a great deal of leeway to the trial judge who must make this judgment call." *State v. Newell*, 710 N.W.2d 6, 20–21 (Iowa 2006). And, as excluding evidence under this rule leaves the fact finder deprived of relevant evidence, courts are to use it sparingly. *State v. Buelow*, 951 N.W. 879, 889 (Iowa 2020) ("[A]ll powerful evidence is prejudicial

---

[5] This issue is distinct from whether or not a party was prejudiced by the wrongful admission of hearsay dealt with above.

to one side." (alteration in original) (citation omitted)). So "[i]f the balance between the evidence's probative value and prejudicial effect is relatively close, the evidence should be admitted." *Id.*

As we have stated, the alleged abuse at Timely Mission and the facility's response was a main point of contention in this case, specifically in determining how likely Weaver would be to ask for help. The Estate argued this evidence was to show Timely Mission engaged in a pattern of ignoring abusive behavior. Here, observations, not rumors, of alleged abusive behavior by Blakesley would have probative value to the claims made. And, while Timely Mission argues the probative value of the evidence is decreased by the vague descriptions given, this also decreases the prejudice. Evidence of abuse of dependent persons will often be "at least somewhat prejudicial." *See State v. Huston*, 825 N.W.2d 531, 537 (Iowa 2013) ("In child abuse cases, much evidence will be 'at least somewhat prejudicial. Exclusion is required only when evidence is unfairly prejudicial [in a way that] substantially outweighs its probative value.'" (alteration in original) (citation omitted)). But Timely Mission has not demonstrated the evidence was unfairly prejudicial, it simply states it was. Accordingly, we find nothing unreasonable nor untenable in the district court's determination that the evidence's probative nature was not substantially outweighed by unfair prejudice.

iii. Prior Bad Acts.

Timely Mission's third concern is that the evidence of Blakesley's interactions with residents other than Weaver violated Iowa Rule of Evidence 5.404(b). Under the rule, "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular

occasion the person acted in accordance with the character." Iowa R. Evid 5.404(b)(1). But, "[t]his evidence may be admissible for another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Iowa R. Evid. 5.404(b)(2). "In determining whether to admit prior-bad-acts evidence, we rely on a three-step analysis." *State v. Putman*, 848 N.W.2d 1, 8 (Iowa 2014). First, we "determine whether the evidence is relevant to a legitimate, disputed factual issue." *Id* at 9*.* Then, there "must be clear proof the individual against whom the evidence is offered committed the bad act or crime." *Id.* (citation omitted). Then, if both the relevance and clear-proof requirements are met, the court determines "whether the evidence's 'probative value is substantially outweighed by the danger of unfair prejudice to the defendant.'" *Id.* (citation omitted). To determine if the probative value is substantially outweighed by the danger of unfair prejudice, we look at four factors:

> the need for the evidence in light of the issues and the other evidence available to the [offering party], whether there is clear proof the [opposing party] committed the prior bad acts, the strength or weakness of the evidence on the relevant issue, and the degree to which the fact finder will be prompted to decide the case on an improper basis.

*Id.* at 9–10 (citation omitted).

The Estate argues the evidence was offered not to show that Blakesley acted in conformity with her past actions, but to show that Timely Mission received a pattern of reports to which it "willfully and wantonly failed to respond." *See Thoren*, 970 N.W.2d at 626 ("Prior bad acts evidence is always propensity evidence in the sense that it has the 'potential for the jury to draw the

inference . . . that because the defendant did this kind of thing before, he did it on the charged occasion.'" (alteration in original) (citation omitted)). Timely Mission's argument bypasses[6] the relevance question and jumps to the clear-proof step, arguing that only hearsay supported the statements about Blakesley's treatment of other residents. "In assessing whether clear proof of prior misconduct exists, the prior act need not be established beyond a reasonable doubt, and corroboration is unnecessary." *Putman*, 848 N.W.2d at 10. "There simply needs to be sufficient proof to 'prevent the jury from engaging in speculation or drawing inferences based on mere suspicion.'" *Id.* at 9 (citation omitted). But, while "[t]estimony of credible witnesses can satisfy the clear-proof requirement," "[m]ere speculation or hearsay is not enough." *Thoren*, 970 N.W.2d at 626 (citation omitted) (first alteration in original).

Timely Mission is right that Brandt's, Armstrong's, Haugen's, Thompson's, and Morris's testimony about Blakesley's behavior toward residents was based only on hearsay statements. Those statements are not supported by clear proof and should not have been admitted under rule 5.404(b). The same can be said of Beck's testimony about rumors she heard. But Beck also testified she often saw Blakesley yell at residents other than Weaver and transfer them aggressively— these were not hearsay statements and Timely Mission has not questioned Beck's credibility on these points. So, while a number of the contested statements cannot

---

[6] Timely Mission challenges relevance in its reply brief, but "we have long held that an issue cannot be asserted for the first time in a reply brief." *Young v. Gregg*, 480 N.W.2d 75, 78 (Iowa 1992).

meet the clear-proof requirement, Beck's testimony about what she saw herself can.

We move, then, to the four-part test to determine "whether the evidence's 'probative value is substantially outweighed by the danger of unfair prejudice to the defendant.'" *Id.* (citation omitted). As to need for the evidence, Timely Mission points out the Estate already had evidence of verbal abuse against Weaver, making evidence of Blakesley yelling at other residents unnecessary. Second, we have already determined there was direct testimony that Blakesley swore at and aggressively transferred a resident. Third, the eye-witness evidence of the act was relatively strong and supports the contention that Timely Mission was informed of Blakesley's behavior. These three factors all point to the evidence having probative value—and while evidence of abuse can evoke strong feelings, the evidence here was fairly vague. Beck testified she saw Blakesley swearing, but did not repeat anything verbatim; she also said only Blakesley aggressively transferred residents but did not discuss those residents' reactions or how they were impacted. The evidence focused, instead, on if she reported the behavior regularly and if it continued. With this in mind, we do not find the likelihood of unfair prejudice outweighs the probative value of the evidence if similar evidence is presented at the next trial.

We find the prior bad acts testimony about Blakesley toward other residents from Brandt, Armstrong, Haugen, Thompson, and Morris, as well as Beck's testimony about rumors she heard, should have been excluded by the district court as evidence of prior bad acts for a lack of clear proof; the district court abused its discretion in not excluding that evidence. *Graber v. City of Ankeny*, 616

N.W.2d 633, 638 (Iowa 2000) ("A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law."). But we find no abuse of the district court's discretion in allowing Beck's eye-witness testimony of Blakesley's behavior.

B. IDIA Evidence.

Timely Mission argues the IDIA evidence—specifically referenced by Arbeit and Naughton—was inadmissible[7] evidence wrongly admitted under Iowa Rule of Evidence 5.703, which provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

"[R]ule 5.703 is intended to give experts appropriate latitude to conduct their work, not to enable parties to shoehorn otherwise inadmissible evidence into the case." *In re Det. of Stenzel*, 827 N.W.2d 690, 705 (Iowa 2013). "[E]vidence admitted under this rule is admitted for the limited purpose of showing the basis for the expert witnesses' opinions; it is not admissible as substantive evidence of the

---

[7] Though the district court, in its oral ruling, did not specifically cite rule 5.703, it ruled that "[t]o the extent that [Arbeit] testifies that he relied on [the IDIA report] and that that is reasonable for him to do so in his field of expertise, I will let him indicate that he reviewed it." This language indicates a finding the evidence would not be otherwise admissible but could be entered under the terms of rule 5.703. Then, during an offer of proof made with Naughton, the court reiterated that the IDIA evidence presented concerns with relevance, prior bad acts, and hearsay, but was allowed under the same conditions as laid out for Arbeit. The Estate has not cross-appealed; so, we proceed with the understanding the evidence was otherwise inadmissible and focus our analysis on rule 5.703.

matters asserted therein." *Gacke*, 684 N.W.2d at 183. It also "does not empower an expert witness to testify other experts subscribe to or support his or her opinion" because "[t]his type of testimony is not only insufficient to establish the prerequisite foundation, it relates to the truth of the matter by bolstering credibility and permits an expert to improperly serve as [a] conduit for the opinion of another witness." *CSI Chem. Sales, Inc. v. Mapco Gas Prods., Inc.*, 557 N.W.2d 528, 531 (Iowa Ct. App. 1996) (internal citations omitted); *accord Arnold v. Lee*, No. 05-0651, 2006 WL 1410161, at *5 (Iowa Ct. App. May 24, 2006) (noting that while "introducing an opinion of a nontestifying expert as a basis for the opinion of a testifying witness" is allowed under rule 5.703, "introducing such evidence to corroborate the opinion" is not).

As directed, Arbeit and Naughton both testified only that the IDIA report was consistent with their conclusions. But this limited testimony provided only corroboration—it did not provide information for the basis of their opinions. *Cf. Arnold*, 2006 WL 1410161, at *6 ("Had the district court allowed the [evidence], there is a distinct danger that, because it provided nothing more than another opinion in agreement with [the expert], the jury would have used it as substantive evidence."). The district court abused its discretion in allowing Arbeit and Naughton to testify that the IDIA reports were consistent with their conclusions.[8]

Because the IDIA evidence at issue was inadmissible hearsay, we presume prejudice. Further, our supreme court has noted that "the potential prejudice from

---

[8] We evaluate this evidence in the specific form it was offered—we do not consider and take no opinion on whether the district court should have allowed or suppressed the evidence generally.

the evidence about [an agency's] investigation is quite high. Because administrative agencies are arms of the state, there is a risk that juries will treat agency findings as official, state-sanctioned results." *Thoren*, 970 N.W.2d at 624; *accord Huston*, 825 N.W.2d at 538–39 (collecting cases recognizing "the danger a jury will be unfairly influenced by an administrative agency finding"). And this prejudice exists even if, as the Estate argues, it did not "impl[y] or argue[] that because the 'state papers' existed, therefore abuse happened, and that the jury's job was complete (they could just rely on the State's findings)." The Estate does not argue that using this evidence to bolster its witnesses' credibility did not prejudice Timely Mission, and we will not make that argument for them. *See Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996) ("In a case of this complexity, we will not speculate on the arguments [a party] might have made and then search for legal authority and comb the record for facts to support such arguments."). Again, this is a reversible error that requires a new trial. *See Hawkins*, 929 N.W.2d at 267.

C. Jury Instruction Specifications.

Finally, we turn to Timely Mission's last contention of error—that the district court erred in submitting claims to the jury that were not supported by the evidence. Timely Mission challenges a specification of the negligence instruction which allowed the jury to find Timely Mission negligent for "failing to provide sufficient staffing to care for the needs of [Weaver] and assure her safety" and two punitive-damages specifications that allowed the jury to find Timely Mission liable for acts of its employees if "[t]he employee was unfit and the employer or its managerial agent was reckless in employing or retaining the employee" or if "[t]he employer or its managerial agent ratified or approved the act."

Because we have already determined that a new trial is necessary and our decision may impact what issues are raised on retrial, we will not address if these particular jury instructions were supported by the evidence.

**IV. Conclusion.**

Because prejudicial, inadmissible evidence was allowed into evidence, we reverse and remand for a new trial.

**REVERSED AND REMANDED.**