# IN THE COURT OF APPEALS OF IOWA

No. 24-0916
Filed June 18, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**YEMISSI NADEGE KETO,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Dallas County, Thomas P. Murphy,

Judge.


        A defendant appeals her convictions for first-degree murder and child

endangerment resulting in death.  **AFFIRMED.**


        Jessica Donels of Parrish Kruidenier, L.L.P., Des Moines, for appellant.

        Brenna Bird, Attorney General, and Katherine Wenman, Assistant Attorney

General, for appellee.


        Heard at oral argument by Schumacher, P.J., and Buller and Sandy, JJ.

**SCHUMACHER, Presiding Judge.**

Following the death of her one-year-old son, Yemissi Keto appeals her convictions for first-degree murder and child endangerment resulting in death. Keto claims the district court erred by excluding evidence of domestic abuse as it relates to her insanity defense. Keto also challenges the sufficiency of the evidence for her convictions. Upon review, we affirm.

## I.      Background Facts & Proceedings

On the morning of August 31, 2023, officers from the Waukee Police Department responded to a 911 call from Keto. The dispatch was issued for an "unknown problem." Officers were informed "the caller was possibly sick and vomiting and was requesting an ambulance." Keto met officers at her front door. As they entered the home, the officers noticed a strong smell of bleach. Keto was struggling to speak and appeared distraught. Officers asked what was going on, and Keto responded, "my son." She directed the officers upstairs, where her thirteen-month-old son, D.K., was located, unconscious and not breathing.

Officers found D.K. in a diaper on the floor, face up, and without a pulse. Open containers of cleaning products were strewn upstairs. The floor surrounding D.K. was "very wet and saturated" with what officers would later determine was bleach. Sputum observed around D.K.'s mouth smelled of bleach. Although D.K. was cold to the touch and slightly stiff, responders performed life saving measures. Their efforts produced no signs of life. Responders ceased life-saving measures roughly twenty-five minutes later. D.K. was pronounced dead at the scene.

Meanwhile, officer Chris Kickbush, who was located downstairs, and Stevi Bundy, a mental-health professional serving as an emergency responder for the

Waukee Police Department's crisis intervention team (CIT), spoke with Keto to gather information about what had occurred.[1] Keto was exhibiting signs of physical distress, sweating profusely, and often grabbing her throat. She also appeared to have a slight language barrier. But Keto could answer questions in English about D.K.'s name, date of birth, and how long she had lived in the home. She elaborated when asked about her husband, his work as an over-the-road truck driver, his whereabouts at the time, and her relationship with him.

At multiple points after emergency responders had arrived, Keto said "drink" or "drinking" with nothing further. She denied that she had been drinking alcohol. Keto began coughing and spitting up into a bowl as Officer Kickbush and Bundy talked with her. Bundy noticed her spit-up had a chemical smell. Eventually, Keto was asked directly whether she drank bleach. Keto responded, "Yes." Bundy asked Keto "if she gave her child bleach that morning," and Keto responded, "Yes." Approximately fifteen minutes had passed between the time Bundy and Officer Kickbush began talking with Keto and when she disclosed the involvement of bleach that morning. Only after Keto said she drank bleach did she inform officers that she speaks French as a primary language.

Shortly thereafter, Keto was taken by ambulance for medical treatment. Keto had "significant amounts of swelling in her mouth and in her airway." Given the information that Keto had consumed bleach, hospital staff was concerned the swelling would continue to the point Keto would no longer be able to breathe. She

---

[1] The 911 call that prompted the police dispatch did not indicate a need for a CIT response. Officer Kickbush and Bundy responded because they were near the dispatch location when the dispatch call was issued.

was intubated and sedated accordingly. She remained intubated and sedated until September 2. At the recommendation of hospital staff, officers waited for more than twenty-four hours after the sedatives were discontinued and Keto's breathing tube was removed before interviewing Keto.

On September 3, Detective Bryan Levsen spoke with Keto using an interpreter, Officer Tolidji Hogbonouto. Keto stated that she wanted to die when she drank the bleach on August 31. She confirmed that "the bleach bottles and the containers of cleaning product that were consumed were kept in a . . . cupboard upstairs next to [D.K.'s] bedroom; and they had a lid on them, and that lid was unable to be opened by [D.K.]" She did not remember the answers to some of Detective Levsen's questions. At the end of the interview, Detective Levsen provided Keto his business card in case she wanted to talk further.

On September 4, Keto began talking to an officer who sat watch outside of her hospital room. Keto spoke with the officer in English and did not request a translator. Keto told the officer, "I put cleaning stuff on his face. . . . And the name is [D.K.]" Keto acknowledged, "[D.K.] died." When asked if she knew how D.K. died, Keto responded, "I put cleaning stuff in his face."

After Keto spoke to the officer on watch, Detective Levsen returned per Keto's request. Officer Hogbonouto translated. Keto admitted to drinking bleach in a suicide attempt. She stated she held D.K. down in the spot where emergency responders found him and poured a cleaner over his face because she did not want to leave him behind after she left. She admitted that when the cleaner did not cause D.K. to lose consciousness she held her hand over D.K.'s nose and mouth. After D.K. stopped breathing, Keto drank more bleach. She remembered

calling her brother after D.K. stopped breathing but did not remember how long after these events she called the police.

On September 5, Keto was transferred to the University of Iowa's medical psychiatry unit. There, she exhibited symptoms of tactile, visual, and auditory hallucinations.

The State charged Keto with first-degree murder, a class "A" felony in violation of Iowa Code section 707.2(1)(e) (2023), and child endangerment resulting in death, a class "B" felony in violation of Iowa Code section 726.6(1)(a) and (b). Keto asserted she was not guilty by reason of insanity.

Prior to trial, the State filed a motion in limine to exclude evidence of alleged domestic abuse between Keto and her husband. A hearing on the motion was held. The State argued the evidence was irrelevant and would risk confusing the issues at trial. Keto countered by arguing the evidence was relevant to her insanity defense and that it should be admissible to impeach Keto's husband if he denied being abusive or violent during trial testimony. In a written ruling on the motion, the district court ruled:

> Prior bad acts by the defendant's spouse: Granted. This involves alleged domestic abuse. If he is a witness, such evidence cannot be used to impeach or attack the credibility of the spouse. *But the defendant claims that the evidence is relevant to her insanity defense. Deposition transcripts provided by the parties indicate that trauma may be relevant. For now, the motion is granted. But the defendant may make an offer of proof at trial if there is proper foundation.*

(Emphasis added.)

Three expert witnesses testified at trial: Dr. Andrea Weber and Dr. Steven Bruce on Keto's behalf and Dr. Rosanna Jones-Thurman for the State. Dr. Weber,

a clinical associate professor in psychiatry and internal medicine, diagnosed Keto with severe major depressive disorder with psychosis. Dr. Bruce, a clinical psychologist and professor of psychological sciences, diagnosed Keto with postpartum psychosis and significant major depression. Dr. Jones-Thurman, a forensic and clinical psychologist, disagreed with both diagnoses as they related to the events of August 31.

A jury convicted Keto on both counts.[2] Keto appeals.

## II.    Evidentiary Challenge

Keto challenges the district court's exclusion of evidence of her husband's alleged domestic abuse against her. The State argues the court's "preliminary ruling" about this evidence "did not preserve Keto's argument on appeal." We agree.

"It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).

> A ruling sustaining a motion in limine is generally not an evidentiary ruling. Rather, a ruling sustaining a motion in limine simply adds a procedural step to the introduction of allegedly objectionable evidence. Thus, a motion in limine . . . , if sustained, excludes reference or introduction of this evidence until its admissibility is determined by the trial court, outside the presence of a jury, in an offer of proof.

*Quad City Bank & Tr. v. Jim Kircher & Assocs., P.C.*, 804 N.W.2d 83, 89 (Iowa 2011) (internal citations omitted). Thus, when a motion in limine is sustained, an offer of proof at trial is generally required to preserve error. *State v. Thoren*, 970

---

[2] For the purposes of sentencing, Keto's convictions merged.

N.W.2d 611, 621 (Iowa 2022). But if the "ruling reaches the ultimate issue and declares the evidence admissible or inadmissible, it is ordinarily a final ruling and need not be questioned again during trial." *State v. O'Connell*, 275 N.W.2d 197, 202 (Iowa 1979).

Keto argues the written ruling was final and so error is preserved. She relies on analogy to the facts of *State v. Alberts*, 722 N.W.2d 402 (Iowa 2006). In *Alberts*, the State filed a motion in limine to determine the admissibility of evidence under Iowa's rape-shield law. 722 N.W.2d at 406. The defendant filed a resistance, accompanied by an offer of proof. *Id.* at 406–07. In its oral ruling, the district court stated it would not permit the disputed evidence but noted that if the corresponding witness opened the door, the disputed evidence may become admissible. *Id.* at 407. The supreme court found the district court's admissibility ruling was "definitive" and the defendant was not required to take further action at trial to preserve error. *Id.*

We are unpersuaded by the parallels Keto suggests between the facts of *Alberts* and the facts here. First, the *Alberts* ruling was made after a pre-trial offer of proof and after the defendant submitted "three separate briefs outlining the law surrounding the admissibility of such evidence." *Id.* at 406–07. In contrast, Keto does not point us to any offer of proof in briefing submitted in support of her position

on the issue.[3] Rather, Keto's resistance to the motion appears in the record before us only in the transcript of the motion hearing.[4]

The arguments from both sides concerning the disputed evidence, including arguments on its use for impeachment—which is not at issue on appeal—cover a collective two pages of double-spaced hearing transcript. Keto argued "domestic abuse and violence issues between [Keto's husband] and [Keto] are relevant to the insanity defense," and that "both Dr. Weber and Dr. Bruce consider the abuse . . . a major contributing factor to her insanity." The State countered that there is no clear proof that the alleged abuse occurred, as required for "prior bad act evidence, which this would be, to be admitted." In short, we decline to conclude this brief discussion amounted to "a full opportunity to argue the merits of their respective positions," as the *Alberts* court determined occurred. *Id.* at 407.

Keto also claims the district court's ruling and the ruling in *Alberts* both definitively determined the disputed evidence was inadmissible but conditional. The ruling in *Alberts* was only conditional upon the victim's trial testimony; the district court commented that inadmissible evidence about the victim's character could become admissible if the victim "open[ed] the door." *Id.* On appeal, the supreme court explained, "[e]ven though the district court stated the evidence may

---

[3] The written ruling mentions deposition transcripts that "indicated that trauma may be relevant." The only deposition transcripts included in our record on appeal were submitted in support of a motion in limine over a separate evidentiary dispute. Keto does not provide a citation to any pre-trial offer of proof on the issue on the admissibility of evidence of domestic abuse.

[4] Four motions in limine were filed within the month before the recorded hearing, two from each party. The State filed resistance to Keto's first motion in limine. No resistance filing by Keto appears in the record before us in response to either of the State's motions in limine.

become admissible if R.M. opened the door to her virtue, this does not change the fact that the court's ruling was controlling so long as this door was not opened." *Id.*; *see also* 7 Laurie Kratky Doré, Iowa Practice Series: Evidence § 5.412:1 (2024–2025 ed. 2024) (recognizing inadmissible evidence about a victim's sexual history may become admissible for impeachment purposes in a criminal trial).

In contrast to *Alberts*, this is not a situation where the ruling recognized that the admission of certain evidence may overcome the court's denial of the admissibility of certain other evidence. The "condition" placed here on the evidence's admissibility was a requirement that Keto make an offer of proof at trial—generally, the procedural step to preserve error after a ruling on a motion in limine. *See Quad City Bank & Tr.*, 804 N.W.2d at 89. We are unconvinced that the limine rulings are equally definitive.

As we noted in *State v. Curtis*, No. 22-1069, 2023 WL 4104116, at *4 (Iowa Ct. App. June 21, 2023), "the words of the district court must be given due consideration to evaluate the unequivocal intent of the ruling." *See also Alberts*, 722 N.W.2d at 406 ("The key to our analysis is to determine what the trial court ruling purported to do."). In its ruling, the district court recognized that evidence of domestic abuse could be relevant to Keto's insanity defense and stated the State's motion was granted "for now." The next sentence invited Keto to "make an offer of proof at trial if there is proper foundation." "Because that language can mean the ruling could be reconsidered at a later time during the trial, the ruling was not unequivocal." *Curtis*, 2023 WL 4104116, at *4.

Another parallel Keto attempts to draw is that "both parties treated the court's ruling on the motion as a final decision." *Alberts*, 722 N.W.2d at 407. In

support of this parallel, Keto points to two moments in trial where witness examination either touched on the disputed evidence or approached the subject matter. The first instance occurred during the State's examination of a witness. After a brief discussion off the record, the State ceased its line of questioning and moved on. In the second instance, Keto asked Dr. Jones-Thurman about the disputed evidence—specifically asking whether it alluded to marital "abuse"—without objection. Keto asked three more questions before the State objected, which was sustained and followed by another brief discussion off the record.

Keto also points to the State's statements following the close of evidence. In context, the identified statements made by the State are less about affirmatively contending it was prohibited from presenting the excluded evidence, as Keto characterizes it, and more about proactively addressing the possibility that Keto might argue in closing "that the State has somehow concealed some important evidence." To show the possibility existed, the State referenced Keto's examination of Dr. Jones-Thurman, noted above, and "other questions elicited by the defense to other witnesses about [the disputed evidence]." On balance, if these three moments are not contrary to Keto's argument about treating the ruling as final, they are at least not the support she proposes.

We are unconvinced by Keto's attempts to analogize the facts here to *Alberts*. Unlike in *Alberts*, as noted by the State at oral arguments, Keto "held all the cards" at trial with regard to making an offer of proof concerning this evidence. The written ruling was not unequivocal—it indicated the district court was willing to reconsider its ruling on the evidence as it related to her insanity defense if Keto

made an offer of proof at trial.[5]  But Keto never made this offer of proof.  Thus, error was not preserved.

## III.     Sufficiency of the Evidence

## A.     Standard of Review

"We review the sufficiency of the evidence for correction of errors at law." *State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022) (quoting *State v. Buman*, 955 N.W.2d 215, 219 (Iowa 2021)).  We are bound by a jury verdict supported by substantial evidence.  *Id.*

> Substantial evidence is evidence sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt.  In determining whether the jury's verdict is supported by substantial evidence, we view the evidence in the light most favorable to the State, including all "legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence."

*Id.* (internal citations omitted) (quoting *State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017)).  When applying this analysis, "[w]e consider all evidence, not just the evidence supporting the conviction."  *State v. Ernst*, 954 N.W.2d 50, 54 (Iowa 2021).

A defendant who raises an insanity defense holds the burden of proof.  Iowa Code § 701.4.  The defendant must prove insanity at the time of the offense by a preponderance of the evidence.  *Id.*

## B.     Corroboration of Keto's Statements on September 3

Keto argues her statements on September 3 were not sufficiently corroborated for the jury to rely on them.  She concedes certain "portions of [her]

---

[5] We need not opine on the finality of the ruling for the purposes of impeachment as Keto does not fault the district court for prohibiting impeachment with the disputed evidence.

confession were corroborated," but she claims there was no corroboration for any statement that she harmed D.K. with an "understanding [of] the nature and quality of her actions and [an] appreciati[on of] the difference between right and wrong."

"The general rule is that a confession standing alone will not warrant a criminal conviction unless other proof shows the defendant committed the crime." *State v. Polly*, 657 N.W.2d 462, 466 (Iowa 2003); *see also* Iowa R. Crim. P. 2.21(4). "Corroborating evidence may be either direct or circumstantial. It need not be strong evidence, 'nor need it go to the whole of the case so long as it confirms some material fact connecting the defendant with the crime.'" *State v. Meyers*, 799 N.W.2d 132, 139 (Iowa 2011) (internal citation omitted) (quoting *State v. Liggins*, 524 N.W.2d 181, 187 (Iowa 1994)). The point of corroborating evidence is not to provide independent proof beyond a reasonable doubt that the crime occurred, but rather it is to fortify the truth of the admissions. *Polly*, 657 N.W.2d at 467.

Keto begins her argument with the proposition that "[c]orroboration is particularly important here, where the defendant raises an insanity defense." We discern no indication from the legal authority she provides that a defendant's assertion of the insanity defense alters our usual corroboration analysis. *See generally Polly*, 657 N.W.2d 462; *State v. Hobson*, 284 N.W.2d 239 (Iowa 1979); *Escobedo v. Illinois*, 378 U.S. 478 (1964); *Opper v. United States*, 348 U.S. 84 (1954). To the extent that she is arguing the insanity defense requires a higher standard for a court to find sufficient corroborative evidence, her lack of supportive legal authority waives the argument. *See* Iowa R. App. P. 6.903(2)(a)(8)(3).

On September 3, the date of the confession in dispute, Keto admitted to drinking bleach and disclosed that D.K. also drank bleach. Keto also admitted these acts on August 31 to Bundy and on September 4 to the officer outside her hospital room and again to Detective Levsen. These statements were corroborated by the chemical smell of Keto's vomit, her body's physical reaction that required intubation at the hospital, the strong chemical odor throughout the house, D.K.'s sputum that smelled like bleach around his mouth, and the bleach-soaked carpet surrounding D.K. when emergency responders arrived. Given these facts, Keto's confession on September 3 was supported by enough other evidence for a jury to be justified in believing Keto's statements were true.

Keto admitted to smothering D.K. on September 4. Keto's argument on appeal does not challenge the reliability of her statements made in the September 4 interview with Detective Levsen. But to be sure, the State presented evidence to corroborate these statements too. D.K. had injuries on both sides of his nose near his nostrils that the autopsy examiner testified would not be caused during life-saving measures. An injury on the inside of his lip suggested pressure had been applied "on the outside of the lip, pushing that lip down on the tooth." D.K.'s cause of death was suffocation. And no one else was present in the home on August 31; Keto was the only person who could have caused these injuries. *See State v. Vargas*, No. 23-0422, 2024 WL 707295, at *4 (Iowa Ct. App. Feb. 21, 2024) (considering opportunity as a corroborating factor). Again, based on the evidence presented, the jury was justified in believing Keto's statements on September 4 were true.

## C.     Insanity Defense

Keto also argues she should not have been convicted because she proved her insanity defense.

The jury was instructed that to find Keto not guilty by reason of insanity, Keto was required to prove by a preponderance of the evidence that "[a]t the time the crime was committed, Ms. Keto suffered from such a diseased or deranged condition of the mind as to render her incapable of" either: (1) "knowing the nature and quality of the acts she is accused of," or (2) "distinguishing between right or wrong in relation to the act."   The jury was also instructed, "To know and understand the nature and quality of one's acts means a person is mentally aware of the particular acts being done and the ordinary and probable consequences of them."

"[A]n insanity defense often comes down to a 'battle of the experts'. . . ." *State v. Martin*, No. 23-0454, 2024 WL 2842318, at *3 (Iowa Ct. App. Jun. 5, 2024) (quoting *State v. Wadsworth*, No. 16-1775, 2018 WL 2230666, at *8 (Iowa Ct. App. May 16, 2018)).   In such cases, the roles of the fact finder at trial and reviewing courts on appeal are as follows:

> When conflicting psychiatric testimony is presented to the fact finder, the issue of sanity is clearly for the fact finder to decide.  The trial court as trier of fact is not obligated to accept opinion evidence, even from experts, as conclusive.  When a case evolves into a battle of experts, we, as the reviewing court, readily defer to the district court's judgment as it is in a better position to weigh the credibility of the witnesses.

*State v. Jacobs*, 607 N.W.2d 679, 685 (Iowa 2000) (internal citations omitted).

Keto presented two expert witnesses in her defense.   Dr. Weber testified she believed Keto was suffering from psychological difficulties at the time that D.K.

died. When asked her opinion on whether Keto "was capable of knowing and understanding the nature and quality of her actions" on August 31, Dr. Weber responded, "I believe she was severely depressed for months." She then expressed doubts that the psychosis she had diagnosed Keto with had developed in six days following D.K.'s death.

Dr. Bruce testified he believed that on August 31 Keto was suffering from psychological difficulties, "not able to . . . form a specific intent," and not capable of distinguishing between right and wrong. Dr. Bruce testified regarding the factors he considered in forming this belief. He explained what signs and symptoms Keto presented before August 31 that are commonly reported by individuals experiencing psychosis, such as lack of sleep, nightmares, and headaches. After August 31, Keto also displayed signs of tactile, auditory, and visual hallucinations—symptoms Dr. Bruce explained were "consistent . . . with psychosis for sure."

The State presented expert testimony from Dr. Jones-Thurman, who disagreed that on August 31 Keto was unable to differentiate right from wrong or was unable to understand the nature and consequences of her actions. She based this opinion on Keto's decision to call 911 and her brother after D.K. stopped breathing, Keto's ability to communicate with emergency responders, and Keto's statement to officers in the days following August 31 that "she knew what she did was bad."

Dr. Jones-Thurman also disagreed that Keto was suffering from postpartum depression or postpartum psychosis. On postpartum psychosis, Dr. Jones-Thurman explained,

> It's very rare. It occurs in one or two out of one thousand child-bearing women within the first two to four weeks after delivery. And the onset is rapid, sometimes as early as two or three days after childbirth.
> . . . .
> [H]omicidal behavior rarely [occurs] in women who have postpartum psychosis.

She also explained, psychosis is generally not a state of mind that one would experience "acute[ly] and then kind of stop and come back [from]," with the exception of specific circumstances not relevant here. Prior to August 31, Keto had no diagnoses of postpartum depression and there was no indication anyone had noticed Keto experiencing hallucinations, delusions, paranoia, or abnormal thoughts or speech patterns. Dr. Jones-Thurman also found it telling that there was no "collateral evidence" of psychosis, such as a house in disarray, neglect of personal hygiene, excessive retail spending, or substance abuse.

On appeal, Keto counters that "all the cited pieces of evidence have other, competing inferences that can be drawn from them." Even so, "this is not a case where proof of [sanity] depends upon a single piece of evidence from which two reasonable inferences could be drawn." *State v. Keeton*, 710 N.W.2d 531, 535 (Iowa 2006). The evidence contained conflicting expert testimony, and it was the jury's role to weigh the experts' credibility and make findings of fact accordingly. *See Jacobs*, 607 N.W.2d at 685.

In addition to her experts' testimony, Keto argues the evidence presented raises reasonable inferences that she was legally insane on August 31. But she does not explain how the evidence overcame the presumption of sanity, which the jury was instructed applied here. And a jury is free to reject a defendant's

interpretation of the evidence presented. *State v. Jones*, 967 N.W.2d 336, 343 (Iowa 2021).

Keto's actions, admissions, and testimony, and the reasonable inferences available from them, are sufficient for a reasonable jury to credit Dr. Jones-Thurman's testimony rather than testimony from Keto's expert witnesses. Detective Levsen testified that on September 4 Keto explained to him why she poured bleach on D.K. and suffocated him. Keto planned to kill herself and did not want to leave D.K. behind. Detective Levsen asked Keto if she suffocated [D.K.] "because the bleach wasn't causing him to pass out?" Keto responded, "Yes." The jury watched the footage of Detective Levsen's body cam which captured this conversation. In sum, the jury could reasonably conclude that Keto was mentally aware of the ordinary and probable consequences of her acts of pouring bleach on D.K.'s face and of obstructing his mouth and nose with her hand—that D.K.'s death would result.

"[I]t is not for us to interfere with the finding made when supported by substantial evidence, even though the evidence may have also supported a finding favorable to the defendant." *Keeton*, 710 N.W.2d at 535. Because it was reasonable for the jury to accept Dr. Jones-Thurman's expert opinion over the opinions of Keto's experts, substantial evidence supports the jury's conclusion that Keto failed to prove her insanity defense.

## IV. Conclusion

Because Keto did not make an offer of proof at trial on the evidentiary challenge she now raises, error is not preserved. Corroborative evidence of Keto's

confession exists in the record to support the guilty verdicts. And the jury was free to reject Keto's insanity defense based on the expert testimony presented at trial.

**AFFIRMED.**